AROMATIQUE, INC., Appellee/Cross–Appellant,

v.

GOLD SEAL, INC., and Darrell Bufford, Appellants/Cross–Appellees.

Nos. 93–3260, 93–3482.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 15, 1993.

Decided July 6, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied Sept. 20, 1994.*

---

\* McMillian, Circuit Judge, would grant the suggestion for rehearing en banc.

Hermann Ivester, Little Rock, AR, argued, for appellants/cross-appellees.

James H. Druff, Little Rock, AR, argued (James H. Druff, Gary N. Speed and Kathryn Bennett Perkins, on the brief), for appellee/cross-appellant.

Before JOHN R. GIBSON,** HANSEN and MORRIS SHEPPARD ARNOLD, Circuit Judges.

PER CURIAM.

For the reasons given in Parts I and II of the opinion filed by Judge Morris Sheppard Arnold, the judgment of the district court is reversed and the order is vacated. Aromatique's federal trademarks at issue here, Reg. Nos. 1,492,855 and 1,492,856, are cancelled. Gold Seal's request for attorneys' fees is denied.

MORRIS SHEPPARD ARNOLD, Circuit Judge.

This case began as an action filed in 1987 in the Chancery Court of Cleburne County, Arkansas, for infringement of Aromatique's trade dress. It was removed to federal district court after Aromatique amended its complaint to include a count of infringement of its recently registered federal trademarks for the trade dress at issue. Gold Seal counterclaimed for cancellation of the registration. The district court merged the trial on the merits with the hearing on Aromatique's motion for a preliminary injunction. The case was tried to the bench over ten days in September and October of 1988. Judgment in favor of Aromatique and an order enjoining Gold Seal from further infringement and

awarding attorneys' fees to Aromatique were entered in September of 1993, 833 F.Supp. 739. Gold Seal appeals the judgment and the injunction; Aromatique cross-appeals for an accounting and disgorgement of profits.

## I.

The trademarks at issue are the packaging of two of Aromatique's products, "The Smell of Christmas" and "The Smell of Spring." Aromatique first began marketing The Smell of Christmas in October, 1982, and The Smell of Spring in 1983. The Smell of Christmas is a potpourri the fragrance of which is associated with Christmastime; The Smell of Spring is a potpourri the fragrance of which is intended to evoke feelings of springtime. The packaging for both products is similar: the potpourri is packaged in pillow-shaped double cellophane bags that are closed at the top by gathering excess cellophane and tying the cellophane closed with cord tied in a square-knot bow. The small packages of The Smell of Christmas are closed with either red or green cord; the large are closed with both red and green cord. The Smell of Spring is packaged in a similar manner, but gold is its dominant color rather than red and green. The Smell of Spring is tied closed with an ecru cord. Each product has an oval label on one side of the cellophane bag: the Christmas product has a red label with gold writing and a gold border; the Spring product has a gold label with writing and border in a contrasting tone of gold. The prospective purchaser can both see and smell the potpourri, which has, according to Aromatique, aesthetic as well as olfactory appeal, by looking at the product through the transparent packaging and smelling the product through the center of the gathered cellophane.

Since 1987, both of Aromatique's products at issue here have included a metallic gold cord tied as part of the square knot. A folded, gold-colored tag apparently hangs from the gold cord. The tag includes the company name "Aromatique" with the initial

** The HONORABLE JOHN R. GIBSON was Circuit Judge of the United States Court of Appeals for the Eighth Circuit at the time this case was submitted and took senior status on January 1, 1994, before the opinion was filed.

A depicted as an illuminated upper case A printed with a woodblock. The tag also bears the trademark "the smell that remembers" in an italic typeface. The marks as described in the registrations do not include the hanging tag. The oval labels depicted and described in the registrations are blank: the Christmas label is red with a gold border and the Spring label is all gold. As described in the registration there are no words or marks that identify the products as those of Aromatique, except for the shape and configuration of the packaging itself which Aromatique, of course, claims identifies Aromatique as the source of the products.

On July 1, 1985, Aromatique filed applications with the United States Patent and Trademark Office to register the trade dress of the two products as trademarks. The PTO refused to register the marks because the they were not distinctive. In January of 1986, Aromatique submitted a brief and accompanying affidavit and exhibits arguing that the marks had acquired secondary meaning through Aromatique's use of the marks. The PTO again refused to register the marks, but this time concluded that they were not registrable because they were primarily functional. Aromatique then argued that others marketed potpourri in different packages and that the packaging for which registration was sought was "a configuration-type mark recognized as a good source indicator and constituting registrable subject matter." On June 21, 1988, the PTO registered the marks as Reg. Nos. 1,492,855 (for "The Smell of Christmas" trade dress) and 1,492,856 (for "The Smell of Spring" trade dress). The marks had previously been registered in several states, including Arkansas. The trademarks for the names "The Smell of Christmas" and "The Smell of Spring," as well as trademarks for Aromatique's name and label, were not subjects of Aromatique's action against Gold Seal, and, therefore, of course, the court's decision today has no effect on those marks.

Gold Seal argues that it began using its trade dress before 1985. In that year it sold a potpourri called "Holiday Essence" in a clear, cellophane bag tied at the top with a red cord. Aromatique, through its attorneys, wrote to Gold Seal in October of 1985 asserting that Gold Seal's trade dress was infringing Aromatique's registered federal and state trademarks. The letter described Gold Seal's product and packaging as "aromatic room freshener" in a "clear plastic bag ... gathered at the neck" and tied with red cord. Affixed to the bag was a gold-colored oval label. (The PTO had at this time not yet registered Aromatique's claimed trade dress.) Gold Seal subsequently changed its packaging, using for a short time fabric ribbon instead of cord, and then began again to use cord. Gold Seal also changed its label, substituting for the gold oval a circular gold label with a serrated circumference (as around a seal), bearing the legends "Natur-Scent Potpourri" and "Holiday Essence" in black ink.

In 1986, Gold Seal's products included "Holiday Essence" and "Spring Essence." Gold Seal continued to use the circular, serrated label with black ink, but used a green cord with a gold mylar thread woven into the cord. At trial, Sandra Horne, vice president of Aromatique, testified that she did not believe that this packaging infringed Aromatique's trade dress.

In 1987, Gold Seal replaced the circular label with a label shaped like a butterfly. Holiday Essence now had a gold butterfly label with red ink; the package was closed with three cords, one green, one red, and one gold, that had been twisted together. Spring Essence used a gold butterfly label with blue ink; the package was closed with a white cord and a gold cord. Both products were dyed. By this time, Aromatique was also using gold cord to tie its packaging and had dyed its products. Holiday Essence was dyed so that most of its contents was either green or red, matching closely the green of the cord and the red of the label and cord. The potpourri was thus dyed in brighter hues of green and red than Aromatique used to dye its potpourri. By the time of the trial, in the autumn of 1988, Gold Seal had changed Spring Essence to include a light blue cord instead of the white one, and had dyed some of its contents to match the blue ink of the label.

Aromatique considered Gold Seal's changes in its dress in 1987 from the serrated label to the butterfly, from the single cord to the multiple cord, and from black ink to colored ink, to be changes designed to infringe Aromatique's trade dress. In that year, Gold Seal received a second letter from Aromatique demanding that it cease and desist infringing Aromatique's trademarks because Gold Seal's packaging was confusingly similar to Aromatique's own. Aromatique again asserted that Gold Seal was infringing registered state and federal trademarks although federal trademarks for the asserted trade dress still had not been registered. As a result of Gold Seal's failure to respond to that letter, Aromatique brought the suit that led eventually to this appeal.

Because of Horne's admission that Gold Seal's products of 1986 do not infringe Aromatique's trade dress, the accused products are limited to Gold Seal's Holiday Essence and Spring Essence sold after 1986. Similarly, the testimony and pleadings excluded from the set of accused products Gold Seal's other similarly packaged products such as "Wisteria Essence" and "Mulberry Essence," which were admitted into evidence at trial.

## II.

### A.

 Trade dress is the "total image of a product, the overall impression created, not the individual features." *Woodsmith Publishing Co. v. Meredith Corp.*, 904 F.2d 1244, 1247 (8th Cir.1990). But the mere method and style of doing business is not protectable. *Prufrock Ltd. v. Lasater*, 781 F.2d 129, 131–32 (8th Cir.1986). Indeed, " '[i]t would be ludicrous ... to suggest that in our free enterprise system, one producer and not another is permitted to take advantage of [a] marketing approach to enhance consumer reception of its product.' " *Prufrock, supra*, 781 F.2d at 132 (quoting *Haagen–Dazs, Inc. v. Frusen Gladje, Ltd.*, 493 F.Supp. 73, 75 (S.D.N.Y.1980)). Trade dress does not protect one from a competitor's imitation of one's marketing concept. *Prufrock, supra*, 781 F.2d at 132.

 In order to form the basis for an action under the Lanham Act, a trade dress must satisfy three criteria: 1) it must be distinctive; 2) it must be nonfunctional; and 3) there must be a likelihood that it will be confused with the accused product. *Two Pesos, Inc. v. Taco Cabana, Inc.*, — U.S. —, ——, 112 S.Ct. 2753, 2758, 120 L.Ed.2d 615 (1992); *Prufrock, supra*, 781 F.2d at 132. Gold Seal contends that Aromatique's asserted trade dress satisfies none of these criteria. The trial court found the asserted trade dress to be distinctive, to be nonfunctional, and likely to be confused with the accused products. We have held that the question of whether each of the criteria is satisfied is a question of fact. *Prufrock, supra*, 781 F.2d at 132–33. The trial court's findings, therefore, cannot be disturbed unless they are clearly erroneous. *Prufrock, supra*, 781 F.2d at 132–33. A finding is clearly erroneous when although there is evidence to support the finding, "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985), *quoted in Prufrock, supra*, 781 F.2d at 133. My review of the evidence has convinced me that a mistake was made.

██ The difference between trade dress and trademark is no longer of importance in determining whether trade dress is protected by federal law. Trade dress, regardless of whether it is registered, is protectable under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). *See Two Pesos, supra*, — U.S. at ——, 112 S.Ct. at 2760; *see also id.*, at ——–——, 112 S.Ct. at 2761–66 (Stevens, J., concurring) (discussing the expansion and transformation of Section 43(a) as interpreted by the courts). Indeed, trade dress may now be registered on the Principal Register of the PTO. The trade dress at issue in this case was so registered. Aromatique has a right of action, therefore, under Section 32, 15 U.S.C. 1114 (remedies for infringement of registered trademarks), as well as Section 43(a).

 There is an important difference, however, between registered trademarks and

unregistered marks or dress. Under Sections 7(b) and 33(a) of the Lanham Act registered marks are entitled to certain presumptions. 15 U.S.C. §§ 1057(b) § 1115(a).[1] We have held that registration of a mark creates a rebuttable presumption that the mark is valid. *WSM, Inc. v. Hilton,* 724 F.2d 1320, 1326 (8th Cir.1984). Registered marks, therefore, are presumed to be distinctive and nonfunctional. The parties to this lawsuit have spilled much ink arguing about the burden of proof, particularly with respect to the issue of functionality. It is true, as Aromatique argues, that there is a split in the circuits over whether a party asserting a mark must prove the mark is nonfunctional or whether instead the party seeking to invalidate a mark must prove that it is functional. *Compare Merchants & Evans, Inc. v. Roosevelt Bldg. Prods. Co.,* 963 F.2d 628, 633 (3d Cir.1992) (party asserting mark must prove it to be nonfunctional) *and Rachel v. Banana Republic, Inc.,* 831 F.2d 1503, 1506 (9th Cir.1987) (same) *with Computer Care v. Service Sys. Enter.,* 982 F.2d 1063, 1068 (7th Cir.1992) (party seeking to invalidate mark must prove it to be functional) *and LeSportsac, Inc. v. K Mart Corp.,* 754 F.2d 71, 76 (2d Cir.1985) (same). It is also true, however, as Gold Seal argues, that we have settled the question in this circuit by requiring a party asserting a mark to prove that it is nonfunctional. *Woodsmith Publishing,* 904 F.2d at 1247. But in all of those cases the plaintiffs were asserting unregistered marks. Aromatique, as the owner of the registered marks at issue here, is entitled to the presumption that the marks are valid. *WSM, supra,* 724 F.2d at 1326. Gold Seal is, of course, entitled to rebut that presumption. *Id.*

## B.

A distinctive trademark is one that is capable of identifying the source of goods because it is either inherently distinctive or, if not inherently distinctive, has acquired distinctiveness by acquiring secondary meaning. Prior to the decision of the Supreme Court in *Two Pesos,* some courts had held that an unregistered trade dress must show that it had acquired secondary meaning even if the dress was in fact inherently distinctive before it could be the subject of an action for infringement under Section 43(a). *See In re DC Comics, Inc.,* 689 F.2d 1042, 1050–51 (C.C.P.A.1982) (Nies, J., concurring). In *Two Pesos,* the Supreme Court held that inherently distinctive trade dress need not have acquired secondary meaning before bringing an action under Section 43(a). —— U.S. at ——, 112 S.Ct. at 2758. In so holding, the Supreme Court refused to treat trade dress differently from trademarks. At ——, 112 S.Ct. at 2759.

Aromatique registered the dress at issue here as trademarks. In the course of the proceedings before the PTO, Aromatique first attempted to register its trade dress without a showing of secondary meaning. The PTO refused registration because the marks were not inherently distinctive. Aromatique responded to that refusal by arguing that its marks could be registered under Section 2(f) of the Lanham Act, 15 U.S.C. § 1052(f), because its marks had acquired secondary meaning. Aromatique presented evidence to support its claim.

■■■ The marks at issue cannot be inherently distinctive as a matter of law. The submission of evidence under Section 2(f) to show secondary meaning, in either *ex parte* proceedings (such as an application to register a trademark) or subsequent oppositions, amounts to a concession that the mark sought to be registered is not inherently distinctive. *Yamaha Int'l Corp. v. Hoshino Gakki Co.,* 840 F.2d 1572, 1577 (Fed.Cir. 1988); Trademark Manual of Examining Procedure § 1212.02(a) (1986 rev.) (the current version of the TMEP is to the same effect, Trademark Manual of Examining Procedure § 1212.02(b) (2d ed. 1993)). It is clear, furthermore, that a pillow-shaped package is commonplace and is, therefore, not entitled to registration absent a showing of secondary meaning. The shape itself merely results from partially filling a concededly ordinary bag with potpourri and tying it closed. It is not the sort of arbitrary shape that has been held to be protectable as

---

1. Section 33(a) was amended in 1988, after the conclusion of the trial. I do not believe that the change in language in that section affects the outcome of this case.

a trademark. *See, e.g., In re Days–Ease Home Products Corp.*, 197 U.S.P.Q. (BNA) 566 (T.T.A.B.1977) (container for liquid drain opener shaped to resemble a drain-pipe); *In re International Playtex Corp.*, 153 U.S.P.Q. (BNA) 377 (T.T.A.B.1967) (package for baby pants shaped like an ice cream cone); U.S. Trademark Reg. No. 696,147, August 12, 1960 (Coca–Cola bottle shaped to resemble the coca bean); *Ex parte Haig & Haig, Ltd.*, 118 U.S.P.Q. (BNA) 229 (Comm'r Pats.1958) (Haig Pinch Bottle registered as container for Scotch whisky). So common, in fact, are pillow-shaped containers that the Trademark Trial and Appeal Board recently refused to register such a container: "In view of the admitted common use of this type of package in other fields and its obvious use as means of containing relatively small products, we believe that under these circumstances more direct evidence of distinctiveness is required...." *In re Cabot Corp.*, 15 U.S.P.Q.2d (BNA) 1224, 1229 (T.T.A.B.1990). Aromatique's marks, therefore, are not protectable unless the pillow-shaped packaging, together with the gathered cellophane, tied cord and oval label, has acquired secondary meaning.

 It follows, then, that the relevant presumption to which Aromatique is entitled, as the owner of marks registered under Section 2(f), is not the presumption that the marks are inherently distinctive, but rather that the marks had acquired distinctiveness. In a case involving a registered trademark where acquired distinctiveness (i.e., secondary meaning) is an issue, the timing of the effectiveness of that presumption is crucial. Distinctiveness became an issue in the ex parte proceedings before the PTO once the applications for the marks had been rejected for lack of distinctiveness and the applicant had presented evidence of secondary meaning. The PTO resolved the issue in Aromatique's favor when it registered the marks. Aromatique's marks, therefore, may be presumed to have acquired secondary meaning only as of June 21, 1988. *See Harsco Corp. v. Electrical Sciences, Inc.*, 9 U.S.P.Q.2d (BNA) 1570, 1571–72 (TTAB 1988).

Aromatique first alleged that Gold Seal was infringing the marks at issue here in a letter sent to Gold Seal in 1985. The description in Aromatique's complaint, which corresponds to the description in the 1985 letter, made clear that it alleged infringement dating back to 1985; an amendment to the complaint made on the eighth day of trial specifies that Aromatique included among the accused products all of Gold Seal's Holiday Essence and Spring Essence products. Thus, Aromatique has alleged that Gold Seal used as early as 1985 a trade dress the same as or similar to the dress Aromatique registered under Section 2(f) in 1988. In this action, therefore, Aromatique is not entitled to the presumption that its trade dress had acquired secondary meaning, and the trial court's conclusion that the asserted marks are valid because Gold Seal failed to rebut the presumption of secondary meaning is clearly erroneous. Even if Aromatique were entitled to the presumption of secondary meaning, however, Gold Seal would still prevail because it presented sufficient evidence to overcome such a presumption.

 In order to establish secondary meaning, the user of a mark, or, here, a dress, must show that by long and exclusive use in the sale of the user's goods, the mark has become so associated in the public mind with such goods that the mark serves to identify the source of the goods and to distinguish them from those of others. *Co–Rect Prods., Inc. v. Marvy! Advertising Photography, Inc.*, 780 F.2d 1324, 1330 (8th Cir.1985). The inquiry here is whether trade dress alone, that is, a potpourri packaged in pillow-shaped double cellophane bags that are closed at the top by gathering excess cellophane and closing it with cord (red and/or green and gold for Christmas and gold and ecru for Spring) tied in a square-knot bow with an oval label (red and gold for Christmas and gold alone for Spring), identifies the potpourri as a product of Aromatique even when Aromatique's other marks (e.g. "The Smell of Christmas" and the woodblock upper-case A) are illegible or obscured.

The evidence Aromatique presented apparently satisfied the PTO because the Office eventually allowed the marks to be registered. The trial court found that secondary meaning was established (or the presumption

of secondary meaning created by the registration of the dress was not rebutted) in part because of Aromatique's exclusive use, substantial promotion, advertising, and sales of the dress, and in part because Gold Seal intentionally copied Aromatique's trade dress.

In determining whether there is secondary meaning, "the chief inquiry is whether in the consumer's mind the mark has become associated with a particular source." *Co–Rect Prods., supra,* 780 F.2d at 1332–33. Consumer surveys and testimony of consumers, therefore, may be the only direct evidence of secondary meaning and should be considered in determining whether a mark has acquired such meaning. *Woodsmith Publishing, supra,* 904 F.2d at 1249; *Co-rect Prods., supra,* 780 F.2d at 1333 n. 9. No such evidence was presented to the trial court or to the PTO. We must determine, then, whether secondary meaning can be inferred from the evidence that was presented.

The existence of secondary meaning of a mark may be inferred from evidence of deliberate copying of that mark, *Harlequin Enter. v. Gulf & Western Corp.,* 644 F.2d 946, 950 (2d Cir.1981), but a contrary inference may nevertheless be drawn once other evidence has been considered. *See Co–Rect Prods., supra,* 780 F.2d 1324. Where there is a demand for a type of product, capitalizing on that demand by copying that product does not necessarily indicate that the original product has secondary meaning. *Cicena Ltd. v. Columbia Telecommunications Group,* 900 F.2d 1546, 1552 (Fed.Cir.1990). The copying that was present here cannot support an inference of secondary meaning. There is no doubt that Gold Seal deliberately copied Aromatique's Spring and Christmas *products.* Gold Seal's products, however, were consistently and clearly labeled with Gold Seal's own trademarks, some of which are registered. Gold Seal's butterfly label is prominently featured on its packaging, as Aromatique's name and logo, the woodblock upper case A, are prominently featured on Aromatique's packaging. Gold Seal's conspicuous placement of its identifying marks must be seen as an attempt to distinguish its potpourri from Aromatique's. *See L.A. Gear, Inc. v. Thom McAn Shoe Co.,* 988 F.2d 1117, 1134 (Fed. Cir.) (holding that defendant's trade dress was not likely to be confused with that of plaintiff because of conspicuous placement on accused dress of defendant's identifying marks), *cert. denied,* —— U.S. ——, 114 S.Ct. 291, 126 L.Ed.2d 240 (1993); *see also Venn v. Goedert,* 319 F.2d 812, 816 (8th Cir.1963) (quoting *Winston & Newell Co. v. Piggly Wiggly Northwest, Inc.,* 221 Minn. 287, 22 N.W.2d 11, 16 (1946), and finding no trade dress infringement under Minnesota's common law of unfair competition where the accused infringer had labeled its products). Because of Gold Seal's conspicuous use of its own trademarks, therefore, it was clearly erroneous to infer from Gold Seal's copying of Aromatique's product that the marks at issue here had acquired secondary meaning.

As part of its applications submitted to the PTO Aromatique submitted articles, testimonial letters from many of its retailers, evidence of advertising, and evidence of the success of Aromatique's products as evidence from which the PTO was to infer that its trade dress had acquired secondary meaning. At trial, Aromatique offered additional articles, further evidence of Aromatique's commercial success, and testimony, including anecdotal evidence, to bolster its claim of secondary meaning. Gold Seal sought to limit and discredit this evidence, and presented evidence of third party use of similar trade dress.

In support of its claim to registrability under Section 2(f) Aromatique submitted copies of advertisements of its potpourri and other products. In each of the advertisements, the identifying names and marks Aromatique, Smell of Christmas (or Spring), and the woodblock A are prominently displayed. These marks were present on the oval label on the depicted packages, as well as in the advertising copy. In none of the advertisements is the dress depicted without such identifying marks. The advertisements submitted with the application cannot establish secondary meaning because they do not separate the claimed dress of the products from the other marks that serve to identify the products as those of Aromatique. *Applica-*

*tion of Mogen David Wine Corp.*, 372 F.2d 539, 541 (C.C.P.A.1967) (holding that applicant's submitted advertisements did not prove that decanter bottle for wine, which had been the subject of a design patent, had acquired secondary meaning); *Application of McIlhenny Co.*, 278 F.2d 953, 956–57 (C.C.P.A.1960) (holding that bottle for pepper sauce could not be registered without label where all the submitted advertisements depicted the bottle with labels emphasizing applicant's registered trademark "Tabasco" and its company name). The advertisements are evidence only of the secondary meaning attached to Aromatique's other registered and unregistered marks, whose secondary meaning is not at issue here.

■ The amount Aromatique spent on advertising and promoting its products, moreover, less than $250,000, is probably too low to accord it much probative value. *See Cicena, supra*, 900 F.2d at 1551. The trial court erroneously concluded that Aromatique had spent in excess of $562,000 on advertising and promoting its products. That amount incorrectly includes more than $315,000 that Aromatique spent on travel in connection with promotional activities and sales. Expenditures on advertising and promoting a trademark may be relevant to a determination of secondary meaning because the amount spent may be indicative of the extent to which the public associates that advertised mark with the source of the product bearing the mark. The amount spent on travel, which is dependent in part on the distance traveled and the class of travel and accommodations, is of no relevance to a determination of whether the promoted trade dress identifies, in the minds of the consumers, the source of the product. Indeed, in the affidavit Aromatique submitted to the PTO in January of 1986 in support of its claim of secondary meaning, it alleged only that by that time it had spent $7800 in advertising and $21,750 in promotional expenses, omitting to mention that it had also spent more than $60,000 on travel in connection with promotional activities.

The articles submitted with the applications and introduced at trial are also insufficient to support a claim of secondary mean-

ing of the asserted trade dress. The articles do not distinguish between the trade dress and Aromatique's other marks. Indeed, most of the articles do not depict the trade dress, and none adequately describes it. Furthermore, as I have said, in order to be the basis for an inference of secondary meaning, the articles must in some way indicate a connection in the minds of consumers between the trade dress and Aromatique. Some of the articles seem to have been published in trade journals or the business press. Such articles are not likely to be read by ordinary consumers and do not necessarily reflect the minds of consumers with respect to the necessary connection between Aromatique and its claimed marks.

■ Aromatique also submitted to the PTO thirty-two letters apparently from retail stores or distributors that sold Aromatique's products. Gold Seal demonstrated that these letters should be given little or no weight as evidence of secondary meaning for several reasons. First, the letters are from distributors or retailers of Aromatique's products, and are, therefore, at best only indirect evidence of any connection in the minds of consumers between the trade dress and Aromatique. *See Trademark Manual of Examining Procedure* § 1212.02(c) (2d ed. 1993). Second, the letters are merely copies, in some cases simply photocopies with the blank spaces filled in, of a form letter provided by Aromatique. As in the *Application of Mogen David*, "[i]n substance, they amounted to hardly more than a carte blanche approval of that which had been formulated by a party naturally and understandably desirous of serving its own interest." 372 F.2d at 541. Third, many of the letters contain internal inconsistencies regarding the length of time the signer of the letter distributed Aromatique's products and the date on which the signer first became aware of those products. Fourth, unlike the affidavits in *Mogen David*, the statements submitted here were unsworn. The letters can not provide a reasonable basis for Aromatique's claim that its trade dress has acquired secondary meaning.

■ At trial and as part of its applications Aromatique presented evidence of the sudden and substantial success of its Spring

and Christmas products. But such evidence may not provide the basis for an inference of secondary meaning because something other than the secondary meaning of the trade dress may have been responsible for the success of the product. Success of a product is not among the types of evidence described by the PTO as useful in establishing secondary meaning. Trademark Manual of Examining Procedure § 1212.02(a) (1986 rev.) (current version is TMEP § 1212.06 (2d ed. 1993)). Because the proper inquiry is whether the evidence demonstrates that the purchasing public identifies the asserted mark with the source of the product, *see In re Owens–Corning Fiberglas Corp.*, 774 F.2d 1116, 1125 (Fed.Cir.1985), sales figures alone are inadequate to establish a connection between a product and its source.

Gold Seal successfully rebutted any presumption of distinctiveness by showing that the evidence submitted to the PTO was inadequate to support a finding of distinctiveness. It is clear, too, that the evidence Aromatique presented at trial, including the evidence it had submitted to the PTO, is not sufficient to support Aromatique's claim that its trade dress has acquired secondary meaning.

## C.

Protecting trademarks protects the public and fosters fair competition. *Truck Equip. Serv. Co. v. Fruehauf Corp.*, 536 F.2d 1210, 1215 (8th Cir.), *cert. denied*, 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976). Protecting a functional package as a trademark, however, impedes competition by preventing the public from copying a useful article that it has the right to copy. *In re Water Gremlin Co.*, 635 F.2d 841, 844 (C.C.P.A.1980). "Our society is better served if functional containers (as well as product designs and highly descriptive or generic terms) remain available for use among competitors. To the extent this causes a modicum of confusion of the public, it will be tolerated." *Water Gremlin Co.*, *supra*, 635 F.2d at 844. In order to be protected as a trademark, therefore, a trade dress must be nonfunctional.

Every trademark, by definition, performs a function, namely that of identifying the source of the goods bearing the mark. A feature or design is functional under our analysis, therefore, if it performs some function other than identifying the source of goods. We have adopted the following test for functionality:

> If the particular feature is an important ingredient in the commercial success of the product, the interests in free competition permits [sic] its imitation in the absence of a patent or copyright. On the other hand, where the feature or, more aptly, design, is a mere arbitrary embellishment, a form of dress for the goods primarily adopted for purposes of identification and individuality and, hence, unrelated to basic consumer demand in connection with the product, imitation may be forbidden where the requisite showing of secondary meaning is made. Under such circumstances, since effective competition may be undertaken without imitation, the law grants protection.

*Prufrock*, *supra*, 781 F.2d at 133 (quoting *Truck Equip. Serv. Co.*, *supra*, 536 F.2d at 1217–18). Our test, then, is that trade dress is nonfunctional "if it is an arbitrary embellishment primarily adopted for purposes of identification and individuality. But if the trade dress is an important ingredient in the commercial success of the product, it is clearly functional." *Prufrock*, *supra*, 781 F.2d at 133.

Aromatique's witnesses testified that the trade dress Aromatique sought to protect was the combination of natural-looking potpourri packaged in a pillow-shaped, doubled cellophane bag whose opening was gathered and tied with cords with a hanging tag attached thereto. Aromatique does not claim that any one of these features is protectable; it is, instead, the combination that is at issue. The parties do not dispute, indeed Aromatique's witnesses at times emphasized, that the packaging of Aromatique's products is central to its commercial success. Aromatique's witnesses testified that the appeal of its potpourri is both aesthetic and olfactory: consumers want to see and smell the potpourri before they purchase it. To this end, clear cellophane wrapped in a manner that allows the fragrance of the enclosed product to escape is essential. Furthermore, both

parties described potpourri as a product typically purchased on impulse. An attractive display is therefore necessary.

■ There can be no doubt that the cellophane bag is functional and lacks arbitrary embellishment, especially where a product is sold in part on the basis of its aesthetic appeal. Aromatique argues, however, that *double* bagging, i.e., putting one bag inside another, is arbitrary. The evidence demonstrates otherwise: the oils that both parties use to scent the potpourri are corrosive to many substances, apparently including cellophane. A double bag increases the shelf life of the potpourri. The outer bag may also perform another function as well: it protects the label which is placed on the outer wall of the inner bag. At a distance of several feet, moreover, according to testimony, one cannot determine whether a package of potpourri is double-bagged. The pillow-like shape of the bags is merely the consequence of using ordinary, unprotectable cellophane bags, and cannot be said to be an arbitrary embellishment. Double-bagging, therefore is both functional and, even if nonfunctional, incapable of functioning as an indicator of source of goods.

■ The fragrance of the potpourri is part of its appeal. The aperture created by gathering the cellophane bags and tying them closed allows the fragrance to escape while keeping the potpourri in the bags. Testimony indicated that tying the bags closed was a functional feature of the trade dress. A heat-sealed bag, for example, would not allow the fragrance to escape as readily as a tied bag. The method of closing the bags is functional, therefore, and not an arbitrary embellishment.

■ Aromatique claims that the size and shape of the gathered cellophane forming a flower when the cellophane is tied closed is an arbitrary embellishment. I disagree. The "flowered" top is clearly the result of tying the cellophane closed (instead of, for example, stapling it or sealing it), and must be one of the most common, and least arbitrary, shapes in packaging: every Christmas fruit basket and liquor bottle wrapped in cellophane or plastic that is tied closed has a similarly shaped "flower." Protecting this feature of Aromatique's trade dress would unduly impair competition.

■ Aromatique uses cord to close its packages. Evidence admitted at trial shows that Aromatique, Gold Seal, and their competitors use either ribbon or cord to close packages of potpourri. To allow Aromatique to exclude all others from using cord would unduly impair competition. Indeed, Aromatique did not believe that Gold Seal's 1986 packaging, which used green cord with a gold mylar thread, infringed its trade dress. Although it cannot prevent others from using cords, Aromatique might have a protectable trademark in the colors of its cords. *See Master Distribs., Inc. v. Pako Corp.*, 986 F.2d 219 (8th Cir.1993). The use of red or green or red and green cords on the package of a product intended for sale in connection with the Christmas season, however, is clearly not protectable because such colors are traditionally used for products relating to Christmas and are therefore neither distinctive nor nonfunctional. Aromatique did not argue that its use of an ecru cord on the Smell of Spring is a protectable trademark, and I therefore decline to reach that issue.

Viewed as a whole, Aromatique's asserted trade dress is clearly functional. The dress is not an arbitrary embellishment adopted for purposes of identification and individuality. Instead, the combination of all of the features of the dress, except the size and shape of the label (which may be separately protected trademarks that are not at issue here), are important ingredients in the commercial success of Aromatique's products. Under our definition of functionality in *Prufrock*, the trade dress is functional and, therefore, may not be protected.

### D.

The trade dress at issue here is invalid for two independent reasons: it is not distinctive and it is functional. Aromatique has no right under federal trademark laws to exclude others from using the trade dress asserted here. It need not be decided, therefore, whether there is a likelihood that Gold Seal's products will be confused with those of Aromatique.

Thus, the court today does not reach the issue of whether Gold Seal infringed the asserted trademarks: the marks are invalid so there is nothing to infringe. I note, however, that the features of the trade dress that may be considered distinctive and nonfunctional, namely the shape of the label, the color of the potpourri, and the color of the cords used on the Spring products, are in fact different: Gold Seal's Christmas potpourri is bright red and green, and its Spring potpourri is, in part, dyed blue to match the blue ink on the label; Gold Seal's labels are butterfly-shaped. The look these features create is different from the look that Aromatique's oval labels, muted coloring, and ecru cord (on The Smell of Spring) create. The features that are most similar, the pillow-shaped cellophane bags tied .with cord, are not protectable. Gold Seal is free to copy unprotectable features. Such competition is the essence of our free-market economic system. If Aromatique lost sales because of competition from Gold Seal, that loss is *damnum absque injuria.*

The marks at issue here are neither registrable nor protectable. The federally registered marks should be canceled pursuant to Section 37 of the Lanham Act, which gives courts the power to order the cancellation of registered marks. 15 U.S.C. § 1119. Aromatique has no property rights in invalid marks. Because the marks are not distinctive and are functional, Aromatique may not exclude others from using those marks.

### III.

Because the asserted trade dress is invalid, Gold Seal's claims for attorneys' fees must be addressed. Gold Seal asks us to award it its attorneys' fees under Sections 35 (now Section 35(a)) and 38 of the Lanham Act. 15 U.S.C. §§ 1117 (current version § 1117(a)) & 1120. Section 35 allows a court to award attorneys' fees to the prevailing party "in exceptional cases." Section 38 of the Lanham Act makes a person who procured the registration of a trademark by fraudulent means liable for any damages sustained as a consequence of that fraud. 15 U.S.C. § 1120. The only damages that Gold Seal seeks is recovery of its attorneys' fees.

### A.

The issue of whether attorneys' fees are available as damages under Section 38 has not been satisfactorily resolved in this circuit. We recently suggested, in a footnote, that we doubted that costs could be recovered under that section. *Gilbert/Robinson, Inc. v. Carrie Beverage–Missouri, Inc.,* 989 F.2d 985, 991 n. 5 (8th Cir.1993) (holding that defendant was not entitled to any damages under Section 38). That doubt arose from an earlier case, decided under the provisions of the Lanham Act in effect before 1975. *Wrist–Rocket Mfg. Co. v. Saunders Archery Co.,* 578 F.2d 727, 734 (8th Cir.1978). In 1975, Congress amended the Lanham Act to include, in Section 35, a clause allowing the award of attorneys' fees in "exceptional cases." In *Wrist–Rocket,* in interpreting Section 38 to allow recovery of damages except for attorneys' fees, we followed the Supreme Court's decision in *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967), and the Second Circuit's decision, relying on *Fleischmann,* in *Blue Bell, Inc. v. Jaymar–Ruby, Inc.,* 497 F.2d 433 (2d Cir.1974).

■ In *Fleischmann* the Supreme Court distinguished between the English Rule of damages and the American Rule. The English Rule is that costs, including attorneys' fees, are awarded to the prevailing party in an action as a "necessary appendage" to the judgment. 3 W. Blackstone, *Commentaries on the Laws of England* 399 (1768). That rule had its origins in the thirteenth century in the Statute of Gloucester, 6 Edw. I., c. 1, which provided that the successful plaintiff could recover the costs of his suit, including fees. It was not until the sixteenth century that a defendant could recover costs and fees, 23 Hen. VIII, c. 15, although in one particular case a thirteenth-century defendant had been awarded his costs in an action involving wardship in chivalry (one of the feudal incidents of tenure). Statute of Marlbridge, 52 Hen. III, c. 6; *see generally* 3 W. Blackstone, *Commentaries, supra,* at 399–401.

The American Rule is that parties must bear their own costs absent a specific statutory provision shifting them. *See, e.g., Fogerty v. Fantasy, Inc.,* — U.S. —, —, 114 S.Ct. 1023, 1033, 127 L.Ed.2d 455 (1994); *Alyeska Pipeline Co. v. Wilderness Society,* 421 U.S. 240, 247–62, 95 S.Ct. 1612, 1616–24, 44 L.Ed.2d 141 (1975); *Fleischmann, supra,* 386 U.S. at 717–19, 87 S.Ct. at 1406–08. In *Fleischmann,* the district court had awarded the plaintiff its attorneys' fees under Section 35 because the defendant had willfully infringed plaintiff's trademark. Section 35 did not at that time have a specific provision allowing the awarding fees, but did (as it does now) allow the plaintiff to recover "the costs of the action." The Supreme Court held that "in the context of statutory causes of action for which the legislature had prescribed intricate remedies," such as actions for trademark infringement under the Lanham Act, where Congress did not specifically allow for the recovery of fees and had omitted fees from its definition of costs, attorneys' fees were not recoverable as part of a litigant's costs. In *Wrist–Rocket,* therefore, when we considered whether the language "damages sustained in consequence" of false or fraudulent registration, as specified in Section 38, we applied *Fleischmann* to that section and held that fees could not be recovered. 578 F.2d at 734.

In the light of the Supreme Court's most recent interpretation of a fee-shifting statutory provision, *Fogerty, supra,* — U.S. at —, 114 S.Ct. at 1023, the rule in *Wrist–Rocket* must obtain here. At issue in *Fogerty* was whether a successful defendant in an action for copyright infringement could recover attorneys' fees under Section 505 of the Copyright Act of 1976 absent a showing that the plaintiff's unsuccessful suit was frivolous or had been brought in bad faith. Section 505 specifies that "the court may also award a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505. The Court rejected both the argument of the petitioner that Section 505 in effect enacted the English Rule in actions for copyright infringement, and the holding of the Ninth Circuit, from which petitioner had appealed (*see Fantasy, Inc. v. Fogerty,* 984 F.2d 1524 (9th Cir.1983)), that the standard for awarding fees to a successful defendant was stricter than the standard for awarding fees to a successful plaintiff, that is, that the defendant must show that the case was frivolous or had been brought in bad faith but that a plaintiff need not make such a showing. The Court adopted instead the rule that, under Section 505, plaintiffs and defendants "are to be treated alike, but attorney's fees are to awarded to prevailing parties only as a matter of the court's discretion." — U.S. at —, 114 S.Ct. at 1033.

The Court's conclusion in *Fogerty* is particularly relevant here for two reasons. First, as the Court noted, the fee-shifting provision of the law of copyright is more closely related to the fee-shifting provisions in the areas of trademarks and patents than to similar provisions in other areas of the law. *Fogerty, supra,* — U.S. at — n. 12, 114 S.Ct. 1028 n. 12. Second, Section 505, like Section 35 of the Lanham Act (which now explicitly mentions fees), permits rather than mandates an award of fees. Section 38, on the other hand, commands that a person who procured registration of a mark by false or fraudulent means "shall be liable for any damages sustained in consequence thereof." 15 U.S.C. § 1120. If an award of fees were required by Section 38, that requirement would deprive courts of the discretion to award fees under Section 35, which discretion is limited to exceptional cases. 15 U.S.C. § 1117(a).

■ The conclusion that fees are not included within damages awarded under Section 38 is, moreover, consonant with the more general tenor of the law of trademark: As discussed above in Part II.A., a plaintiff may well have common-law and state trademark rights in a mark that is fraudulently registered, because a mark need not be federally registered to form the basis of a cause of action under state law or the Lanham Act. Aromatique might, indeed, have had such rights in the marks at issue here if the marks were distinctive, nonfunctional, and otherwise enforceable. Thus, if we held that Section 38 required an award of fees, we might then require the anomalous result that a plaintiff with valid state and federal common-law trademarks could owe fees to a defendant

who infringed valid trademarks. The better rule would allow the court, considering the equities of the particular case, to award attorneys' fees in exceptional cases. This is what Section 35 does.

█ Courts have defined the characteristics of exceptional cases with adjectives suggesting egregious conduct by a party. We have held that an exceptional case is one in which the plaintiff's action was groundless, unreasonable, vexatious, or pursued in bad faith. *Hartman v. Hallmark Cards, Inc.,* 833 F.2d 117, 123 (8th Cir.1987). The Seventh Circuit recently described exceptional behavior in this context to be "malicious, fraudulent, deliberate, or willful." *Badger Meter, Inc. v. Grinnell, Corp.,* 13 F.3d 1145, 1159 (7th Cir.1994). Succinctly put, an exceptional case within the meaning of Section 35 is one in which one party's behavior went beyond the pale of acceptable conduct.

### B.

Gold Seal alleges that Aromatique's conduct was exceptional because that conduct was fraudulent. Gold Seal argues that that conduct was fraudulent for two separate but related reasons. First, Aromatique's letters to Gold Seal demanding that Gold Seal cease and desist its infringement of Aromatique's trade dress falsely asserted that the trade dress had been federally registered. An applicant's false claim that a mark is a federally registered trademark may improperly discourage competitors from using a mark that they in fact have a right to use and may thereby enable an applicant to assert that its use of the mark is substantially exclusive. It is, therefore, the rule that "[t]he improper use of a registration notice in connection with an unregistered mark, if done with intent to deceive the purchasing public or others in the trade into believing that the mark is registered, is a ground for denying the registration of an otherwise valid mark." *Copelands' Enter. v. CNV, Inc.,* 945 F.2d 1563, 1566 (Fed.Cir.1991).

Gold Seal also argues that Aromatique's conduct was fraudulent because of false statements made to, and facts withheld from, the PTO during Aromatique's applications for registration of the marks at issue in this case. Aromatique, according to Gold Seal, deliberately misled the PTO by submitting affidavits alleging its long and exclusive use of the trade dress when it knew that its use was neither long nor exclusive. For example, in support of its claim that its trade dress had acquired secondary meaning, Aromatique informed the PTO that it had successfully dissuaded others from using the trade dress by sending letters demanding that competitors cease using the dress and by successfully suing competitors. Aromatique did not reveal that at least one of those letters (the letter to Gold Seal) falsely claimed that the dress had already been federally registered. Nor did Aromatique ever reveal that a court had denied a motion for preliminary injunction in one of the actions it filed to enforce its rights in part because the "evidence presented clearly showed that there are many other companies which have introduced a similar Christmas potpourri in cellophane packages." *Aromatique, Inc. v. The Gift Box,* No. B–C–86–113, slip op. at 2 (E.D.Ark. Dec. 16, 1986). That case was subsequently settled. Aromatique's failure to inform the PTO of its false claims that its trade dress had been federally registered may also constitute fraud on the PTO, or gross negligence and reckless disregard of the law, from which an intent to deceive the PTO may be inferred. *Copelands' Enter., supra,* at 1568 & n. 6.

Aromatique defended its actions in part by asserting that an applicant for a trademark owes no duty of candor to the PTO. This is plainly wrong. *See Copelands' Enter., supra,* 945 F.2d at 1567–68; *Orient Express Trading Co. v. Federated Department Stores, Inc.,* 842 F.2d 650, 653 (2d Cir.1988); 1a J. Gilson, *Trademark Protection & Practice* § 8.12[14] at pp. 8–314 to 8–316 (1993); 3 J.T. McCarthy, *Trademarks & Unfair Competition* § 31.21[2][b] at p. 31–101 (3d ed. 1992). Proof that false statements were made to, or that facts were withheld from, the PTO, however, is not enough to show fraud for purposes of canceling a mark because of a party's fraudulent conduct. In order to show that an applicant defrauded the PTO the party seeking to invalidate a mark must show that the applicant intended

to mislead the PTO. *Copelands' Enter., supra,* 945 F.2d at 1568 & n. 6 (citing *Hewlett–Packard Co. v. Bausch & Lomb, Inc.,* 882 F.2d 1556, 1562 (Fed.Cir.1989), *cert. denied,* 493 U.S. 1076, 110 S.Ct. 1125, 107 L.Ed.2d 1031 (1990)).

Aromatique cites *Rosso & Mastracco, Inc. v. Giant Food Inc.* for the proposition that an applicant is not required to disclose to the PTO the existence of other users of a mark if those other users began to use the mark after the applicant had used the mark (i.e., if they were junior users). 720 F.2d 1263, 1266 (Fed.Cir.1983). But "the oath in an application for registration must be truthful." *Id.* The record in this case indicates that Aromatique knew of a number of other users of the asserted trade dress during the pendency of its application. Some of these, indeed, as Aromatique claimed in its applications, may have been dissuaded from using the asserted trade dress because of Aromatique's letters demanding that infringement of its dress cease. Those letters deserve attention.

On October 23, 1985, Aromatique's counsel, who was also handling the applications for the registration of the trade dress at issue in this case, wrote to Gold Seal demanding that Gold Seal cease and desist its infringement of Aromatique's trade dress:

> Based on an examination of a sample of your product, we note for example that you are marketing an aromatic room freshener in a clear plastic bag containing a potpourri visible through the walls of the bag. The bag is gathered at the neck and is tied with red-colored rope cord. The bag when filled measures approximately the same dimensions in width, height and thickness as those of our client.
>
> . . . .
>
> *Our client is the owner of federal and state trademark registrations on such trade dress* including Arkansas Registration No. 260–85 and Arkansas Registration No. 261–85 covering our client's trade dress for its Christmas fragrance and for its spring fragrance. . . .

Plaintiff's Trial Exhibit L (emphasis added). Two years later, Aromatique's attorneys again wrote to Gold Seal, repeating the allegation that Gold Seal was infringing Aromatique's "federal and state trademark registrations."

The meaning of these letters is plain: Aromatique was attempting to dissuade Gold Seal from infringing its trade dress in part by asserting that the trade dress was federally registered. There can be no doubt that Aromatique's counsel knew that the claim that the dress was federally registered was false: Aromatique, through its counsel, had filed the applications for registration and had received, prior to sending the first letter, notice that the applications had been rejected because the claimed marks were not distinctive. Aromatique suggests somewhat tentatively in a footnote in its initial brief submitted to this court that the false statements in the letters might have been inadvertent because Aromatique's marks for the product names "The Smell of Christmas" and "The Smell of Spring" had been registered in March of 1985. But there was no testimony presented at trial to support this interpretation. The first letter, moreover, specifically describes the packaging that is alleged to infringe and is alleged to be federally registered; neither letter makes reference to rights in "The Smell of Christmas" or "The Smell of Spring." The conclusion that the letters were written with the intent to mislead Gold Seal into believing that the asserted trade dress was federally registered is inescapable.

The actions Aromatique took to acquire and enforce rights in the trade dress at issue here are indeed beyond the pale of acceptable behavior. Aromatique's failure to inform the PTO that it had improperly asserted that its trade dress was federally registered in October of 1985 constitutes fraud on the PTO. Its false claims of federal registration constitute fraud against Gold Seal. Gold Seal did in fact change its packaging after receiving Aromatique's first letter; Aromatique supported its assertion of secondary meaning by telling the PTO in January of 1986 that parties that had been informed of Aromatique's rights in its trade dress had ceased using that dress. Aromatique's claim of secondary meaning, therefore, was based in part on its fraudulent assertion to Gold Seal that its dress was federally registered.

This record compels the conclusion that Gold Seal has shown that Aromatique's conduct was exceptional within the meaning of Section 35 of the Lanham Act. I would therefore award Gold Seal its attorneys' fees.

## IV.

For the reasons given, I would not only reverse the judgment of the trial court, vacate the order, and cancel the federal trademarks at issue, but would also award attorneys' fees to Gold Seal and remand this case to the district court for a determination of Gold Seal's attorneys' fees incurred as a result of Aromatique's suit, including the fees incurred on this appeal.

HANSEN, Circuit Judge, concurring.

I concur in the court's judgment. I join parts I, II, and IIIA of the opinion filed by Judge Morris Sheppard Arnold. I write separately to explain why, in my view, Gold Seal is not entitled to attorney fees.

Judge Arnold has ably described, in part IIIA of his opinion, the general principles that apply to a claim for attorney fees under 15 U.S.C. § 1117. I respectfully differ with Judge Arnold, however, about the result of this case. For several reasons, I believe fees are not appropriate.

First, Gold Seal sought attorney fees not as a claim accompanying its own infringement action but in response to Aromatique's infringement action. In *Hartman v. Hallmark Cards, Inc.*, 833 F.2d 117 (8th Cir. 1987), we held that under § 1117, "defendants will be allowed to recover fees in exceptional cases in order to 'provide protection against unfounded suits brought ... for harassment and the like.'" *Id.* at 123 (quoting S.Rep. No. 93–1400, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.C.C.A.N. 7132, 7136). Although Gold Seal has prevailed on appeal, Aromatique's infringement claim was not completely unfounded and, as a whole, was pursued in good faith.

Second, Gold Seal sought attorney fees not for the conduct of Aromatique's principals but rather for the pre-litigation conduct of Aromatique's attorneys. Of course, an attorney is an agent of his or her client, but I

believe an award of fees on this basis would not be prudent. Claims for attorney fees under § 1117(a) are best analyzed by focusing on the trademark infringement itself. *See, e.g., Moore Business Forms, Inc. v. Ryu*, 960 F.2d 486, 492 (5th Cir.1992); *Ferrero U.S.A., Inc. v. Ozak Trading, Inc.*, 952 F.2d 44, 48–49 (3d Cir.1991); *West Des Moines State Bank v. Hawkeye Bancorporation*, 722 F.2d 411, 414–15 (8th Cir.1983); *cf. Gorenstein Enter., Inc. v. Quality Care–USA, Inc.*, 874 F.2d 431, 435 (7th Cir.1989) (holding that award of attorney fees under § 1117 was harmless error on ground that infringer's attorneys should have been sanctioned because they engaged in dilatory, bad-faith, perjurious, and "shameful" conduct during litigation). The infringement claim in this case was a close one; the district court held for Aromatique, but a divided panel of this court has held for Gold Seal. I believe it would be unfair to impose the considerable burden of attorney fees for this complex action on Aromatique's principals, who sought to protect what they believed to be their exclusive right to use a particular trade dress. I prefer to rely on other measures to remedy suspect conduct by members of the bar.

Third, even if I were predisposed to award § 1117(a) attorney fees to a prevailing defendant based on the conduct of a plaintiff's attorneys, I would conclude that the conduct here does not make this case "exceptional." Because that term is inherently vague, there is unlikely to be widespread agreement on its application unless an infringement action is either clearly garden-variety, *see, e.g., Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1159 (7th Cir.1994) (affirming denial of fees where defendant did not deliberately infringe), or clearly beyond the pale, *see, e.g., Joy Mfg. Co. v. CGM Valve & Gauge Co.*, 730 F.Supp. 1387, 1391, 1395 (S.D.Tex.1989) (holding that fees were appropriate where defendant reconditioned plaintiff's products, affixed plaintiff's nameplate to them, and marketed them as if they were marketed by plaintiff). I am not clearly convinced that Aromatique's attorneys intended to deceive or defraud. I certainly do not intend to endorse their misstatements in their letters

to Gold Seal or their contention that an applicant need not be candid in its trademark application, but other remedies exist to right those types of wrongs. *See* 15 U.S.C. § 1120; *Copelands' Enter., Inc. v. CNV, Inc.,* 945 F.2d 1563, 1566 (Fed.Cir.1991) (holding that PTO may deny registration if applicant has deceived consumers or competitors). In sum, I simply believe that this case is not the exceptional one for which the statute would authorize an award of fees to Gold Seal.

For these reasons, I would deny Gold Seal's claim for attorney fees.

JOHN R. GIBSON, Senior Circuit Judge, dissenting.

I respectfully dissent.

It is regrettable, indeed astounding, that the court today rewards Gold Seal's studied and extensive imitation of Aromatique's trade dress. Stronger words than imitation could, in truth, well be applied to Gold Seal's conduct.

The court today rejects the district court's factual findings that Aromatique's trade dress is distinctive, and holds that as a matter of law it is not distinctive. Distinctiveness, as the court recognizes, is a factual question. Op. at p. 868 (citing *Prufrock, Ltd. v. Lasater,* 781 F.2d 129, 132–33 (8th Cir. 1986)). The court's discussion demonstrates that it violates the teachings of *Anderson v. City of Bessemer City,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), to reject these findings, and substitutes its own factual findings for those of the district court. Furthermore, the court today simply ignores the district court's finding that the trade dress is nonfunctional and proceeds to make its own findings. I believe the district court had substantial evidence upon which to base its findings of distinctiveness and nonfunctionality, and therefore such findings are not clearly erroneous. Accordingly, I would affirm the judgment of the district court.

The court today looks only to the most general lesson of *Anderson.* The court ignores the rule that where there are two permissible views of the evidence, the factfinder's choice cannot be clearly erroneous "even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts." 470 U.S. at 574, 105 S.Ct. at 1511–12. As *Anderson* explains:

> The rationale for deference to the original finder of fact is not limited to the superiority of the trial judge's position to make determinations of credibility. The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise. Duplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources.

470 U.S. at 574–75, 105 S.Ct. at 1512. Contrary to the teaching of *Anderson,* the court today makes the trial simply a " 'tryout on the road.' " *Id.* at 575, 105 S.Ct. at 1512 (quoting *Wainwright v. Sykes,* 433 U.S. 72, 90, 97 S.Ct. 2497, 2508, 53 L.Ed.2d 594 (1977)).

The district court must weigh testimony of expert witnesses. *Hoefelman v. Conservation Comm'n,* 718 F.2d 281, 285 (8th Cir. 1983). *Anderson* states:

> [W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.

470 U.S. at 575, 105 S.Ct. at 1512. In addition, the court today fails to recognize that we must construe the evidence in the light most favorable to the party prevailing in the district court. *Craft v. Metromedia, Inc.,* 766 F.2d 1205, 1212 (8th Cir.1985), *cert. denied,* 475 U.S. 1058, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986); *see Doss v. Frontenac,* 14 F.3d 1313, 1319 (8th Cir.1994). The district court made numerous detailed factual findings, as well as statements on distinctiveness, secondary meaning, likelihood of confusion, and nonfunctionality in its conclusions of law that can only be considered as findings of fact, and must be reviewed as such. *See Co–Rect Prods., Inc. v. Marvy! Advertising Photography, Inc.,* 780 F.2d 1324, 1328 n. 5

(8th Cir.1985) (where a court includes such statements in its conclusions of law, they are factual findings that must be reviewed under the clearly erroneous standard).

### I.

The district court found that Aromatique's trade dress was distinctive, as it had acquired secondary meaning, and that a likelihood of confusion was created. The court today states that "the marks at issue cannot be inherently distinctive," and that Gold Seal's copying "cannot support an inference of secondary meaning," thus making a wholesale substitution of its own views for the district court's detailed findings of fact. Slip op. at 9, 12.

The court today correctly observes that a trade dress is distinctive if it "has acquired distinctiveness by acquiring secondary meaning." Slip op. at 8. Attempts to copy or imitate the trade dress, consumer association of the dress to a source, sales success, advertising expenditures, media coverage about the product, and the length of exclusivity of use of the trade dress should be considered in determining whether the trade dress has acquired secondary meaning, and therefore deserves protection. *Thompson Medical Co. v. Pfizer Inc.*, 753 F.2d 208, 217 (2d Cir. 1985); *see Co–Rect*, 780 F.2d at 1330. The district court considered, in great detail as reflected in its findings, evidence of Gold Seal's imitation of Aromatique's products, evidence of likelihood of confusion in the marketplace, and sales and advertising figures. However, the court today ignores the district court's findings that Aromatique's trade dress acquired secondary meaning.

The error of the court's approach today is best demonstrated by considering the district court's specific findings regarding Gold Seal's imitation of Aromatique's trade dress:

(a) Gold Seal presented its products in pillow-shaped packages decorated with gold foil labels and contained in double-cellophane bags gathered at the top in a "flower." Gold Seal used identical or nearly identical textured gold and colored tie cords, and prominently displayed the words "Heber Springs" on the label.

(b) Gold Seal ... used the identical words on its packages to warn about the oil and promotion of fragrance oil. The warning language was from Aromatique's 1985 flat hang tag and the fragrance promotional language was from Aromatique's 1986 folding hang tag.

(c) Gold Seal purchased the same type of polypropylene cellophane bags from the same vendor that supplies Aromatique instead of another form of cellophane bag, such as polyethylene, which is cheaper.

(d) Gold Seal used the same type of red and green cords made from polypropylene fiber in the identical shades of color as Aromatique's cords and purchased the cords from the same vendor as Aromatique.

(e) When Aromatique added a gold metallic string to its packages in 1987, it did so in part to distinguish its packages from Gold Seal's. Gold Seal copied that change and added the same type of metallic string to its packages.

(f) When Gold Seal changed from the large round serrated label to the butterfly label in 1987, Gold Seal purchased the butterfly label from the same supplier that had helped design and supply labels for Aromatique. The labels for "The Smell of Christmas".are red and gold while the labels for "Holiday Essence" are gold and red. While the labels for "The Smell of Spring" are gold, the labels for "Spring Essence" are gold and blue.

(g) The bottle Gold Seal used for its refresher oil was identical in shape, size, and color to the bottle Aromatique used. The label of Gold Seal's bottle was black and gold while the label used by Aromatique was brown and gold. Gold Seal packaged the bottle in a box that was identical in shape and size to the box used by Aromatique.

(h) After Aromatique began applying a wash dye to some of the natural elements in its Christmas and Spring products, Gold Seal began dyeing its products.

(i) Gold Seal had a spring scent made by Inter–Continental Fragrances in Houston as a "knock off" of the oil Aromatique used to create the fragrance in "The Smell of Spring."

These key findings demonstrate Gold Seal's persistent pattern of imitating Aromatique's trade dress, as well as the distinctiveness of Aromatique's trade dress. Evidence in the record supports each of these findings, and the court today makes no argument to the contrary. It is most significant that after Aromatique's notification in 1985, Gold Seal ceased many of the practices. However, the district court's findings reflect that in 1987 Gold Seal returned to using not only the red and green cords it had used before receiving Aromatique's notice, but also added the metallic gold cord Aromatique had begun using, and began to use a similar label on the package. It was these later acts that led to the filing of this suit. In addition, although there are other manufacturers in the decorative fragrance industry, only Gold Seal's packages are virtually identical to those of Aromatique. Despite this pattern of findings, the court today ignores *Anderson* and substitutes its own findings.

In considering factors relevant to the determination of secondary meaning, the district court also found that the evidence of Aromatique's national magazine advertisements, television exposure, and skyrocketing sales all supported its finding that Aromatique's trade dress had acquired secondary meaning. The court today quibbles with the district court's finding that Aromatique spent in excess of $562,000, but concedes that Aromatique spent up to $250,000 in promotional and advertising expenses between February 1, 1982, and July 31, 1988. The court's statement that the amount Aromatique spent "is probably too low to accord it much probative value" demonstrates that the court is making its own findings of fact. *See* slip op. at 14. The court imposes its own view regarding what amount of money spent on advertising and promotion is sufficient to support an inference of secondary meaning, and further

finds that $250,000 is too little to indicate secondary meaning. The court also ignores Aromatique's phenomenal rise in sales, from approximately $239,000 in 1982 to almost $9.5 million in 1988, which strongly indicates that Aromatique's products acquired secondary meaning. The court makes no effort to apply the clearly erroneous standard to these findings. *Cf. Cicena Ltd. v. Columbia Telecommunications Group,* 900 F.2d 1546, 1547 (Fed.Cir.1990) (promotional expenditures considered with direct advertising expenditures to determine existence of secondary meaning).

Another factor a court should consider in determining whether the trade dress deserves protection is the likelihood of confusion. The district court held that just as Gold Seal's intent to copy the overall appearance of Aromatique's products gives rise to an inference of secondary meaning, such intent also implies a likelihood of confusion. Gold Seal's founder, Mr. Bufford, testified about his company's efforts to "compete" with Aromatique. He admitted copying the wording on Aromatique's package.[1] Bufford hired several of Aromatique's production employees, and his intentional copying resulted in essentially identical packaging and created actual confusion to consumers. Furthermore, the district court found that Gold Seal copied Aromatique's trade dress, and concluded that this raised an "inescapable inference of confusing similarity."

The district court also considered additional evidence of likelihood of confusion, including: the strength of Aromatique's mark, the similarity with Gold Seal's marks, Gold Seal's intent to pass off its goods as Aromatique's products, the type of product, conditions of purchase, competitive proximity and incidence of actual confusion. The district court found numerous incidents of actual confusion by retailers and the public as strong evidence of a likelihood of confusion. For example, a retailer of Gold Seal testified that one customer who had purchased an Aromatique product at another retailer attempted to re-

---

1. The district court also found that Bufford entered Aromatique's warehouse without authorization in July 1984 and was seen looking for information pertaining to fragrance oil. Bufford also attempted to determine the price Aromatique paid for its supplies, and was unhappy when he was not told.

turn it to a Gold Seal dealer. This retailer also overheard some customers walking by her Gold Seal display with one remarking that the product must be from the company in Heber Springs, and referring to the butterfly on the package, and another responding that Aromatique makes potpourri in Heber Springs.

The court today states that consumer surveys and testimony may be the only direct evidence of secondary meaning, and that no such evidence had been presented during the trial or to the patent office. This statement directly contradicts factual findings, as outlined above, that retailers testified as to actual confusion of consumers, and to the likelihood of confusion. The court today recognizes that secondary meaning may be inferred from evidence of deliberate copying, but fails to acknowledge the district court's clear findings of Gold Seal's imitation of Aromatique's trade dress and the resulting likelihood of confusion.

By completely overlooking the district court's detailed findings in support of its conclusion that Gold Seal's imitation, evidence of actual confusion, media coverage, and advertising expenses all indicated that Aromatique's trade dress has acquired secondary meaning and its finding of a likelihood of confusion, the court today ignores the teachings of *Anderson* that when there are two permissible views of the evidence, the factfinder's choice cannot be clearly erroneous. 470 U.S. at 574, 105 S.Ct. at 1511–12.

## II.

The court today also finds Aromatique's packaging to be functional, and therefore unprotected. Purely functional packaging, such as a cardboard box or glass jar, is unprotected. *See In re Water Gremlin Co.,* 635 F.2d 841, 844 (C.C.P.A.1980) (protecting container designed to provide access to lead sinkers). In general, functionality requires that a design "cannot practically be duplicated through the use of other designs." Restatement (Third) of Unfair Competition § 17, cmts. a & b (Tent.Draft No. 2 1990). A feature is essential and therefore functional "only if the feature is dictated by the functions to be performed." *Stormy Clime Ltd.*

*v. ProGroup, Inc.,* 809 F.2d 971, 975 (2d Cir.1987) (quoting *Warner Bros., Inc., v. Gay Toys, Inc.,* 724 F.2d 327, 331 (2d Cir.1983)); *Brunswick Corp. v. Spinit Reel Co.,* 832 F.2d 513, 519 (10th Cir.1987) (if the feature must be "slavishly copied in order to have an equally functional product, then the feature is not entitled to protection").

Our cases make clear that functionality or nonfunctionality is a question of fact to be reviewed under a clearly erroneous standard. *Prufrock, Ltd. v. Lasater,* 781 F.2d 129, 132–33 (8th Cir.1986); *Truck Equip. Serv. Co. v. Fruehauf Corp.,* 536 F.2d 1210, 1217–19 (8th Cir.), *cert. denied,* 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976).

Today the court makes no effort to review the findings of the district court bearing upon nonfunctionality, but simply makes its own findings of fact. Indeed, the court today does not even refer to the findings of the district court with respect to the functionality issue, nor to the conclusions the district court reached based upon those findings. The district court specifically found that Aromatique had shown through expert and lay witnesses that there are numerous other ways to package potpourri or decorative room fragrances, factoring in expense, visibility and aroma, and that upholding the protection of the combination of the elements composing Aromatique's trade dress would not hinder competition in the potpourri decorative fragrance industry. These findings go directly to the determinative issue with respect to functionality, namely "whether protection against imitation will hinder the competitor in competition." *Truck Equip.,* 536 F.2d at 1218; *see also Woodsmith Publishing, Inc. Co. v. Meredith Corp.,* 904 F.2d 1244, 1247 n. 6 (8th Cir.1990). The court today completely fails to mention these factual findings, much less analyze them under the clearly erroneous standard.

Moreover, the court exhaustively makes its own findings of fact on the several specific features of the trade dress, rather than considering the total image or the overall impression created. By dwelling in detail on the separate features of the trade dress rather than on the whole dress and the overall

impression, the court accepts an argument of Gold Seal that directly conflicts with decisions in this Circuit. *See Woodsmith,* 904 F.2d at 1247; *General Mills, Inc. v. Kellogg Co.,* 824 F.2d 622, 627 (8th Cir.1987).

As the district court recognized, but the court today largely ignores, functional elements that are separately unprotectable can be collectively protected as part of the trade dress. *Computer Care v. Service Sys. Enters., Inc.,* 982 F.2d 1063, 1071 (7th Cir.1992). The district court also correctly recognized that functionality is not decided solely on whether individual elements are nonfunctional, but also on whether a distinctive visual impression has been created. *Id.; Qualitex Co. v. Jacobson Prods. Co., Inc.,* 13 F.3d 1297, 1303 (9th Cir.1994) (in a trade dress case, the court must look at the product as a whole); *White Swan, Ltd. v. Clyde Robin Seed Co.,* 729 F.Supp. 1257, 1260 (N.D.Ca. 1989). The district court made findings relating to alternative designs, as we have observed, that although trade dress may have utilitarian attributes, it may be deemed nonfunctional where such alternative designs are available. The district court found that Aromatique had established by a preponderance of the evidence that the trade dress was nonfunctional, that a feature of trade dress is nonfunctional when it is adopted for purposes of identification and individuality and not because it is related to basic consumer demands in connection with the product, and that functional elements separately unprotectable can be protected together as part of trade dress with the focus not on individuality, but on whether a distinctive visual impression had been created. While this discussion is contained in the conclusions of law, we must treat the statements as findings of fact. *See Co–Rect,* 780 F.2d at 1328 n. 5. These statements are supported by substantial evidence in the record that the overall image and impression of Aromatique's trade dress is an arbitrary embellishment, and that the arrangement of features of the dress creates a distinctive commercial impression.

The record supports the finding of nonfunctionality under the principles in *Prufrock,* which states:

[W]here the feature or ... design is a mere arbitrary embellishment, a form of dress for the goods primarily adopted for purposes of identification and individuality and, hence, unrelated to consumer demands in connection with the product, imitation may be forbidden where the requisite showing of secondary meaning is made.

781 F.2d at 133.

The district court's finding that many of the features were nonutilitarian is consistent with testimony at trial about the arbitrariness of the "flower," the double-bagging, and the knotted cord. For example, the crowned top of the flower required careful and close attention, which increased the cost of the package and required extra room in the shipping container. Aromatique used cord which required deliberate and careful tying by hand. The cord was drawn in a square knot, leaving a small opening to allow the aroma of the potpourri to escape. Experts explained that the collocation of these nonutilitarian elements created the "Aromatique look," and described the arrangement as protectable because a distinctive commercial impression was created. Therefore, I do not believe the district court clearly erred when it found that Aromatique's trade dress was nonfunctional, although it may have incidental utilitarian attributes. Furthermore, I believe the district court correctly found it is nonfunctional because alternative designs are available to achieve the same utilitarian ends. *See In re Morton–Norwich Prods., Inc.,* 671 F.2d 1332, 1341 (C.C.P.A.1982) (existence of alternative designs is a key element to determining whether there is non-functionality).

The court today states that the flowered top that results when the double-cellophane bags are tied closed, "must be one of the most common, and least arbitrary, shapes in packaging." Op. at 874. The court states that "every Christmas fruit basket and liquor bottle wrapped in cellophane or plastic that is tied closed has a similarly shaped 'flower.'" *Id.* at 874. I have searched the record in vain for evidence of fruit baskets and liquor bottles, but have found none. The court also believes that protecting the flower, double-bagging, and the knotted cord would impair

competition. This directly contradicts the district court's finding that protecting the arrangement of the elements of Aromatique's trade dress would not hinder competition in the decorative room fragrance industry. The district court ruled that Gold Seal did not prove that Aromatique's trade dress was functional and worthy of protection. It elaborated that a feature of trade dress is nonfunctional when it is adopted for purposes of identification and individuality, and not because it is related to basic customer demands in connection with the product. The court today simply substitutes its findings for those of the district court.

The court today rests its legal conclusion in large part on the statement in *Prufrock* that trade dress is functional if it serves as "an important ingredient in the commercial success of the product." 781 F.2d at 133 (quoting *Truck Equip.*, 536 F.2d at 1217–18 (quoting *Bliss v. Gotham Indus.*, 316 F.2d 848, 855 (9th Cir.1963))). The court suggests that by admitting that its packaging contributes to its commercial success, Aromatique concedes that this "aesthetic functionality" standard has been met.

However, the facts in *Prufrock*, as well as the cases upon which it relies and decisions from other circuits, support a more narrow interpretation than that which the court today gives the aesthetic functionality issue. Courts and commentators alike have cautioned that a broad reading of this aesthetic functionality language would eviscerate the protection afforded by a trademark. *See, e.g., Vuitton et Fils S.A. v. J. Young Enters., Inc.*, 644 F.2d 769, 772–74 (9th Cir.1981) ("[A] trademark is always functional in the sense that it helps to sell goods by identifying their manufacturer."); *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 983 n. 27 (11th Cir.1983) (rejecting instruction to jury that if a "feature of goods or of its wrappers or container appeals to the consumer and *affects* his or her choice, that feature is functional" because nonfunctional elements may affect consumer preferences) (emphasis in original); *Animal Fair, Inc. v. Amfesco Indus., Inc.*, 620 F.Supp. 175, 190 (D.Minn.1985) (court should not view a feature as functional simply because it contrib-

utes to consumer appeal and salability of the product), *aff'd,* 794 F.2d 678 (8th Cir.1986); 1 J. McCarthy, *McCarthy on Trademarks* § 7.25[5] (3d ed. 1992) ("The 'important ingredient in the commercial success of the product' formulation is much too open-ended and vague to be a useful rule of law.").

Moreover, the facts in *Prufrock* show that this language was not central to that court's analysis. There, the district court found the defendant infringed upon the plaintiff's restaurants' trade dress. The district court, however, had defined the protected dress to include the concept of "a full-service restaurant, serving down home country cooking, in a relaxed and informal atmosphere, with a full-service bar" and featuring an open kitchen. 781 F.2d at 131. This court reversed the finding of nonfunctionality, concluding that the district court erred by including Prufrock's 'core concept' in its definition of Prufrock's trade dress. *Id.* The district court had stated that "consumer demand for the concept of 'down home country cooking' includes the demand for the trade dress that creates the concept." *Id.* at 134. Thus, this court denied protection for the various implements of the trade dress which created the desired atmosphere.

Aromatique, however, is not attempting to monopolize the concept of scented room fresheners or potpourri. In sharp contrast to *Prufrock*, this case involves the copying of packaging which, incidentally, is specifically designed to be cut open and thrown away when the product is used. Nothing in *Prufrock* or *Truck Equipment*, upon which the court relied in *Prufrock*, requires protection for aesthetic functionality in mere packaging. *Prufrock* considered trade dress necessary to a "country cooking" restaurant part of its core concept, and *Truck Equipment* involved copying the design of the product, a semitrailer. *See Prufrock*, 781 F.2d at 131; *Truck Equip.*, 536 F.2d at 1213. In fact, there is factual similarity between Aromatique's packaging (which is more complex, expensive to produce, and difficult to pack) and the shape of the trailer in *Truck Equipment*. In *Truck Equipment*, testimony indicated that the trailer was designed to appear dissimilar from others, rather than to reflect

any engineering considerations. 536 F.2d at 1218. An engineering memo stated that the entire rear of the skinside of the trailer was useless and would only gather road dirt and mud. *Id.*

The language in *Prufrock,* including portions quoted by the court today, *see* op. at 873, points to a distinction between the product itself and the packaging. Here, the packaging, intended to be discarded, exists simply to facilitate the sale of the product, enhancing identification and individuality. Other circuits, including the Ninth Circuit which authored *Bliss,* from which this court quoted in *Truck Equipment* and later *Prufrock,* have explicitly recognized a distinction between protection of a product and its packaging. *See, e.g., Fabrica Inc. v. El Dorado Corp.,* 697 F.2d 890, 895 (9th Cir.1983) (accepting "important ingredient" analysis as to product features, but finding it inappropriate "to apply the test to cases involving trade dress and packaging"); *Tas–T–Nut Co. v. Variety Nut & Date Co.,* 245 F.2d 3, 6 (6th Cir.1957) ("[T]he public policy which permits the imitation of an article of commerce is without relevance to the dress in which the article is marketed"); *Restatement of Torts* § 742 cmt. a (1938) (providing protection for goods). By extending the broad aesthetic functionality doctrine to include coverage of Aromatique's packaging, the court today leaves little to deter even the most blatant of copiers. "Full and fair competition requires that those who invest time, money and energy into the development of goodwill and a favorable reputation be allowed to reap the advantages of their investment." *Truck Equip.,* 536 F.2d at 1215. The court today destroys the ability of Aromatique to capitalize on its carefully tended image.

### III.

The court today goes far beyond merely holding that Gold Seal's challenged products do not infringe those of Aromatique. The court could have simply decided that whatever the extent of Aromatique's property interest in its trade dress, Gold Seal's products did not infringe on that interest. Instead,

the court concludes that Aromatique's federal registered marks should be cancelled.[2]

The court's reasoning simply does not support such a sweeping remedy. According to the court today, Aromatique's trade dress consists of:

> A potpourri packaged in pillow-shaped double cellophane bags that are closed at the top by gathering excess cellophane and closing it with cord (red and/or green and gold for Christmas and gold and ecru for Spring) tied in a square-knot bow with an oval label (red and gold for Christmas and gold alone for Spring).

Op. at 870. The court concludes that those portions of Aromatique's dress which Gold Seal appropriated were functional and not distinctive. In concluding that no infringement occurred, the court explicitly relies on the fact that Gold Seal used a label that differed significantly from Aromatique's. Op. at 871. The court today never even suggests that the color, size, shape and appearance of Aromatique's label is functional or not distinctive. Similarly, the court purports to decline reaching protectability of the ecru-colored cord on Aromatique's Smell of Spring. Yet, the court holds that Aromatique "may not exclude others from using [its] marks," including apparently the aesthetic details of its labeling and cord. Op. at 875.

Since collections of features incorporating otherwise unprotected elements may warrant protection, *see Qualitex,* 13 F.3d at 1303 and *Computer Care,* 982 F.2d at 1071, this court should not conclude that Aromatique's dress deserves no protection without first considering the entirety of the dress, including the labeling and cord. Since the court does not consider Aromatique's entire dress, it errs in holding that the law affords no protection to Aromatique.

2. Gold Seal did not ask this court to cancel the state trademarks.