**TANEL CORPORATION, Plaintiff,**

v.

**REEBOK INTERNATIONAL, LTD., Defendant.**

**Civ. A. No. 90–10652–K.**

United States District Court, D. Massachusetts.

April 13, 1990.

Jerr Cohen, Perkins, Smith & Cohen, Boston, Mass., for plaintiff.

Mark Schonfeld, Stephen S. Young, Sherburne, Powers & Needham, Boston, Mass., for defendants.

## MEMORANDUM AND ORDER

KEETON, District Judge.

This is a suit for relief from alleged trademark infringement. Plaintiff Tanel Corporation ("Tanel") is the owner of a registered trademark "360°" for shoes. Defendant Reebok International, Ltd. ("Reebok"), a manufacturer of casual and athletic shoes and clothing, is using the mark "360°" on one of its models of basketball sneakers.

Plaintiff's claims for injunctive relief and damages are based on 15 U.S.C. § 1114(1). Defendant has counterclaimed under 15 U.S.C. § 1119 for cancellation of plaintiff's trademark registration. Plaintiff moved for a temporary restraining order, which was granted by this court on March 20, 1990. A hearing and oral argument were held on plaintiff's motion for a preliminary injunction on April 4, 1990, and both parties have filed briefs and affidavits in connection with this motion. Upon consideration of all supporting and opposing submissions, I conclude that plaintiff's motion for a preliminary injunction should be granted.

### I.

A court may grant a preliminary injunction when the plaintiff will suffer irreparable injury if the injunction is not granted; such injury to the plaintiff outweighs any harm the injunction would inflict on the defendant; the plaintiff exhibits a likelihood of success on the merits; and the public interest will not be adversely affected. *Planned Parenthood League of Massachusetts v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir.1981). "In a trademark case, the key issue is the likelihood of success on the merits because the other decisions will flow from that ruling." *Keds Corp. v. Renee International Trading Corp.*, 888 F.2d 215, 220 (1st Cir.1989). The Lanham Act requires a liberal interpretation of the irreparable injury factor. *Camel Hair & Cashmere Institute of America, Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6 (1st Cir.1986). If Reebok is unlawfully infringing Tanel's trademark, "irreparable harm follows from the injury to the goodwill and reputation plaintiff has developed

in its mark." *Trak Inc. v. Benner Ski, K.G.,* 475 F.Supp. 1076, 1078 (D.Mass. 1979). As for the balance of harms, Reebok sells millions of pairs of athletic shoes annually and these shoes are spread across a great many product lines. Reebok's shoes bearing the 360° mark are only one model in one of Reebok's series of basketball shoes. Reebok began production of this series in the summer of 1989, and has stated that its marketing of these shoes would be short-lived in any event. The losses Reebok claims it will suffer if injunctive relief were granted include financial losses on orders for existing shoes and damage to its customer relations. When these losses are weighed against the fact that plaintiff has engaged in extensive advertising and promotion of its mark over the past four years and the fact that plaintiff is now entering the retail sales market, I conclude that the harm to plaintiff outweighs any harm to defendant. Finally, the public interest is served by promoting fair competition and preventing consumer confusion.

Defendant contends that plaintiff has not demonstrated a probability of succeeding at trial on the merits. It argues, first, that plaintiff's mark is not registrable because it is descriptive without secondary meaning and thus is not entitled to trademark protection. Defendant also contends that even if plaintiff's mark is registrable, there is no likelihood of confusion between the marks.

## II.

■ Section 33(a) of the Lanham Act, 15 U.S.C. § 1115(a), provides that any registration issued under the Act "shall be prima facie evidence of registrant's exclusive right to use the registered mark in commerce on the goods or services specified in the registration." "The effect of registration is to shift the burden of proof from the plaintiff to the defendant, who must introduce enough evidence to rebut the presumption of plaintiff's right to exclusive use." *Keebler Co. v. Rovira Biscuit Corp.,* 624 F.2d 366, 373 (1st Cir.1980). Reebok contends that 360° refers directly to a characteristic of Tanel's shoes—a cir-

cular pivot device located on the sole. Plaintiff responds that the mark is only suggestive of the shoes' pivotability. "Descriptive" and "suggestive" are two categories of terms used in trademark analysis; the scope of protection accorded to each varies.

A descriptive term merely describes a characteristic or ingredient of the article to which it refers. A descriptive term can become a trademark only if it has acquired a secondary meaning, so that the consumer associates the term with a particular producer's goods. A suggestive term suggests rather than describes the characteristics of the goods to which it is affixed. Such a term, which invokes the consumer's perceptive imagination, can be protected without proof of secondary meaning.

*Keebler,* 624 F.2d at 374 n. 8.

■ One test for distinguishing between descriptive and suggestive marks focuses on "how immediate and direct is the thought process from the mark to the particular product." *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 349 (9th Cir.1979). The more direct the process, the more likely the term is to be descriptive; the more thought, imagination, or perception required to link the mark with the goods, the more likely the term is to be suggestive. The term "360°" does describe the circular shape of the cleat on Tanel's shoes. However, the term does not "directly convey to the buyer the ingredients, qualities, or characteristics of the product." *Educational Development Corp. v. Economy Co.,* 562 F.2d 26, 29 (10th Cir.1977). As plaintiff observes, one must remember that 360 is the number of degrees in a circle, somehow connect that circle to movement, and imagine that the mark relates to pivotability of the shoe.

■ Another test looks at whether a competitor would need to use the term to describe its goods, that is, whether other equally effective words are available. *Id.* Certainly other terms are available to convey the idea of pivotability or of a circular cleat, if any competitors wished to market a shoe with these features. Reebok's

shoes are part of a line of basketball sneakers using the term "Jam" and identified as the *Reebok Jam Series*. "Jam" is a basketball slang term for a slam dunk shot. There are various types of "jam" shots, and Reebok has used the names "Reverse Jam," "Power Jam," "Thunder Jam," "¾ Reverse Jam," "360° Jam," and "Sir Jam" for models in this series. Defendant has no need whatsoever to use "360°" to *describe* its *shoes* or *any characteristic* of its shoes; rather, it appears defendant chose this name to take advantage of the current popularity of these basketball slang terms, not because it was peculiarly suited to describing the shoes in question. I conclude that the significant feature of plaintiff's shoes—pivotability—is only suggested by the mark "360°."

Defendant also argues that numerical marks are inherently weak, citing 3 R. Callman, Unfair Competition, Trademarks and Monopolies § 18.23 (4th ed. 1974, July 1987 revision). However, the same authority takes the position that "[i]f the primary meaning is not grade or quality, then the defendant need not adopt a system similar to the plaintiff's, and he may legitimately be required to avoid confusion by the use of different numerals or letters." *Id.* Plaintiff's mark does not describe a grade or quality of shoes. *Nature's Bounty v. Basic Organics*, 432 F.Supp. 546 (E.D.N.Y.1977), relied on by defendant, involved a registered trademark "B–100" for B complex vitamins with an average potency of 100 milligrams in each vitamin B factor. There was already an accepted trade practice of identifying vitamins C and E by letter name hyphenated with the potency of the tablet, and other companies were using some form of the letter B plus the potency in marketing B vitamins, such as "B–Complex 100." *Id.* at 552. The court concluded that the mark was "merely descriptive" because "the primary purpose and effect of the designation 'B–100' is to denote and describe the ingredients and qualities of the vitamin product to which it has reference." *Id.* There is no evidence of a similar understanding in the shoe trade as to the meaning of "360°."

■ Defendant suggests that the court should attach particular significance to statements and agreements made by plaintiff in connection with its application for registration of this mark. Plaintiff's original application was for the mark "360" (although the shoes themselves were marked "360°"), and registration was refused because of a prior registration held by Roffe, Inc. for warm-up suits, jackets, pants, shirts, and shorts for men and women and for skirts for women. The trademark examiner noted the likelihood of confusion in that Tanel's athletic shoes might be purchased and worn with warm-up suits. Plaintiff then amended its application to seek registration of the mark "360°," and later petitioned to cancel the registration owned by Roffe, Inc. on grounds of abandonment by non-use. In its amended application, plaintiff stated:

> Applicant's trademark 360°, as used on shoes, is a highly suggestive mark. The mark suggests a high level of pivotability which can be characteristic of shoes, and is characteristic of Applicant's shoes. Applicant's shoes, which are field sport shoes, are known for providing a unique high degree of pivotability. In view of this, the mark 360° is a strong mark for such goods.

> In contrast, the mark ROFFE 360 should be considered as a whole. The term ROFFE is a critical portion of the mark. The number 360 as used with ROFFE, on the registrant's goods (which are different than Applicant's goods), has the appearance of a model number. The number alone does not form a memorable or strong mark for clothing.

> The strong suggestiveness of Applicant's mark 360°, used with respect to goods for which a pivoting characteristic is relevant (that is, cleated shoes) can in itself tend to eliminate confusion with a similar mark which is used on different goods (clothing) for which such suggestiveness would not be relevant. While shoes provide a pivot bearing on the ground, clothing does not. Given the differences in the marks 360° and ROFFE 360 and the important difference

in the goods, there is no likelihood of confusion.

March 20, 1987 Amendment at 3. Eventually Roffe, Inc. and Tanel entered into a consent agreement and Tanel withdrew its petition for cancellation. The parties agreed that, in light of the differences in the marks and in the types of goods, they saw no likelihood of confusion. They also noted

> that the suggestiveness of Tanel's mark 360° relates to the fact that the shoes on which the mark is used have a high level of pivotability due to ring-like annular cleating. The specific suggestiveness plays no part in the Roffe mark ROFFE 360, nor could it since pivotability is uniquely a characteristic of shoes. The "360" in the mark ROFFE 360 is suggestive in its own different sense, relating to the concept of versatility, that is, usefulness during any time of the year.

Consent Agreement, ¶ 4. Defendant argues that the language of plaintiff's application and of the consent agreement amount to an admission by plaintiff that "360°" is a descriptive mark rather than a suggestive mark. I reject this interpretation. First, the language makes it clear that the mark was considered suggestive of a characteristic of the shoes, not descriptive of the shoes. Second, the parties were concerned not with validity of the mark but with the likelihood of confusion. It is appropriate to give weight to the views of "those most familiar with use in the marketplace and most interested in precluding confusion" on the question of likelihood of confusion, *Application of E.I. DuPont DeNemours & Co.,* 476 F.2d 1357, 1363 (C.C.P.A.1973), but statements of the type quoted above are not entitled to the same degree of weight in determining whether a mark is descriptive or suggestive.

■ Defendant also contends that plaintiff's use of the Tanel house mark along with "360°" indicates that "Tanel" rather than "360°" is relied on to indicate the source of its shoes. This may bear on the likelihood of confusion of plaintiff's and defendant's shoes, but it is settled that two trademarks can always be used together

without invalidating either mark. *Keds Corp.,* 888 F.2d at 221; *Quabaug Rubber Co. v. Fabiano Shoe Co.,* 567 F.2d 154, 161 n. 12 (1st Cir.1977).

Defendant makes much of the fact that certain of plaintiff's promotional materials and correspondence refer to plaintiff's shoes as "Tanel 360," without a degree symbol. However, the shoes themselves are all marked "360°," as are the shoe boxes, and uses of the term in other materials are far from being so inconsistent in this regard as to weaken its mark.

The Trademark Office's decision to register plaintiff's mark reflects a conclusion that the mark is not descriptive, and that conclusion provides the mark with a presumption of validity. Defendant has not established that its challenge to the validity of plaintiff's mark is likely to succeed, and I conclude that plaintiff will probably succeed on this issue.

### III.

■ The test of infringement is likelihood of confusion, mistake, or deception as to source, affiliation, connection, or sponsorship. *See* 15 U.S.C. § 1114. Several factors must be considered, although no one factor is necessarily determinative. *Volkswagenwerk AG v. Wheeler,* 814 F.2d 812, 817 (1st Cir.1987).

(1) The similarity of the marks. Defendant describes its shoes as sharing a "common element" with plaintiff's, but argues that if one looks at the full name of each party's product there are distinguishable differences. That is, "360°" or "Tanel 360°" is distinguishable from "360° Jam" or "Reebok 360° Jam."

In *E.S. Originals, Inc. v. Stride Rite Corp.,* 656 F.Supp. 484 (S.D.N.Y.1987), cited by defendant in support of this argument, the court found no likelihood of confusion between plaintiff's "ZIP 'N GO" zippered sneakers for children and adults and defendant's "ZIPS" children's sneakers. The court concluded that

> the marks "ZIPS" and "ZIP 'N GO" look and sound different. This conclusion is plain from an examination of the marks. Moreover, the "ZIPS" trademark is al-

ways used in conjunction with the Stride Rite company name and is linked prominently with its line of products.... This prominent addition of the words "by Stride Rite" to "ZIPS" whenever the "ZIPS" mark appears on the product or in advertising and promotional materials significantly reduces the likelihood of confusion between these distinguishable marks.

656 F.Supp. at 488. The Reebok shoes submitted to the court as exhibits in this case have the marking "360° Jam" stitched in gray on the white tongue without the word "Reebok." However, there is a yellow cloth label sewn to the top reverse side of the tongue and "Reebok" is printed in black on that label and is visible just over the top edge of the tongue. "Reebok" is also stitched in gray with a black outline on the outer side of each shoe. However, "Reebok" is not in such close proximity to "360° Jam" that one would necessarily read them together or view them as a single phrase, as was the case with "ZIPS by Stride Rite." Similarly, on the Tanel shoes the 360° mark is on the sides of the shoe without the word "Tanel" (although under a distinctive stylized "T"), while the Tanel logo is on the tongue and back of the shoe. Thus, if one is to look at the full name, the correct comparison would seem to be between the quite similar marks of "360°'" and "360° Jam," without the addition of the house mark, at least in comparing the shoes themselves. The fact that both plaintiff and defendant use these marks in conjunction with their names does nevertheless tend to decrease the likelihood of confusion between the marks. *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 487 (1st Cir.1981).

I note another similarity of appearance not discussed by the parties. In the "Tanel" logo the initial "T" has a long crossbar extending over the other letters in the word. In the marking on the tongue of the Reebok shoes "360°'" appears over the word "Jam," and the serif on the initial "J" has been elongated to extend over the other letters in the word. As a result, the initial "J" is quite close in appearance to the Tanel "T." There is a corresponding similarity of the next two letters of each word: "A" is the second letter of both, and the printed capital letters "M" and "N" are similar. A purchaser examining the shoes in a store most likely would not mistakenly read "Jam" as "Tanel," but confusion at the point of sale is not the only issue; prospective consumers viewing the shoes on other people might misread or misinterpret this logo. *Keds Corp.*, 888 F.2d at 222.

Defendant also argues that plaintiff's consent to the continued use of the mark "Roffe 360" on clothing, and its alleged tolerance of the use of a "360" mark on shoes made by two other manufacturers, are strong evidence that plaintiff's and defendant's marks are not similar. This argument is without merit. It is quite plausible that plaintiff would conclude there was no likelihood of confusion between its shoes and Roffe's "Roffe 360" clothing, despite some similarity between their marks. The evidence shows that plaintiff took appropriate steps to investigate the marketing of other shoes marked "360," and plaintiff's actions indicate that plaintiff did consider even the mark "360," without a degree sign, to be similar. Plaintiff's handling of these matters did not constitute "consent" to use of a similar mark such that this court is now somehow precluded from finding similarity between the marks of plaintiff and defendant.

(2) Similarity of the goods. Defendant contends that the only thing its product has in common with plaintiff's is that they both fit in the general category of shoes. This overstates the case. Both plaintiff's and defendant's shoes are laced athletic shoes. It is true that plaintiff's shoes are designed for use in field sports (although they can also be used for street wear), that defendant's shoes are designed for street wear and for basketball, and that there are differences in retail price ($90 for the Reebok shoes compared to a price range from $49.95 to $67 for Tanel's). Nevertheless there are similarities in the appearance and style of the shoes, especially in those submitted as exhibits. Defendant's product also falls squarely within the scope of

plaintiff's registration, which is for "shoes."

(3) Relationship between the parties' channels of trade.

(4) Relationship between the parties' advertising.

(5) Classes of prospective purchasers.

These three factors are interrelated and will be considered together. *See Boston Athletic Association v. Sullivan,* 867 F.2d 22 (1st Cir.1989).

Since 1986 plaintiff has marketed its shoes through direct sales to high school, college, and professional athletes and coaches. In 1989 plaintiff announced that it would begin to make its shoes available through dealers. Plaintiff has made arrangements with some dealers to carry its shoes, is still engaged in obtaining additional dealers, and expects to begin sales to dealers in late spring of this year. Reebok acknowledges that there is overlap in retailers and distributors. Plaintiff has advertised by direct mailings and in various sports publications, many of which also contained advertisements for Reebok. Reebok also advertises in publications unrelated to sports. Plaintiff and Reebok have exhibited their products at the same sporting goods trade shows; within the last month a Reebok booth displaying samples of 360° Jam shoes was set up directly across from a Tanel display booth.

In the past plaintiff has primarily targeted athletes, coaches, and trainers who are concerned with the possibility of injury; the pivotability of plaintiff's shoes is designed to reduce the risk of knee injuries to those engaging in field sports. Reebok's shoes in the Jam Series are aimed at teenagers, who are as likely to buy them for street wear as for basketball use. However, at least some of Tanel's shoes are also suitable for street wear, and Tanel plans to increase its efforts to capture part of the retail casual or street shoe market. Tanel also has plans to expand into the market for baseball, softball, and basketball shoes.

Thus, although the marketing and purchasers for each product are not identical, there is overlap in these categories that could increase the risk of confusion.

(6) Evidence of actual confusion. Reebok's shoes were only delivered to retailers early in 1990; Tanel's shoes are not scheduled for delivery to retailers until later this spring. Under these circumstances, it is neither surprising nor significant that plaintiff has not presented evidence of actual confusion. In any event plaintiff is not required to show actual confusion in order to prevail. *Volkswagenwerk,* 814 F.2d at 818.

(7) Defendant's intent in adopting the mark. Reebok's purpose in adopting this mark was to use a basketball slang term, "360° Jam," to refer to basketball shoes. There is no evidence that this name was chosen in bad faith. Reebok conducted a trademark search and review process that for some reason led them to believe that Tanel's mark was "360" and not "360°." It appears that either Reebok's trademark search was not as careful as it might have been, or that Reebok concluded that the mark they planned to use would not interfere with plaintiff's rights, or perhaps that Reebok adopted the mark with indifference to whether so doing would infringe on plaintiff's rights. The court is unable to decide this question on the submissions before it.

(8) The strength of the plaintiff's mark. Factors useful in determining a trademark's relative strength include the length of time a mark has been used and the plaintiff's relative renown in its field; the strength of the mark in plaintiff's field of business, especially by looking at the number of similar registered marks; and the plaintiff's actions in promoting its mark. *Boston Athletic Association,* 867 F.2d at 32. Tanel has used its 360° mark in the manufacture, sale, and promotion of its shoes since 1986, and it acquired its trademark in 1988. Plaintiff's shoes have received considerable favorable coverage in the press. It appears that the only similar registered mark is the "Roffe 360" mark for clothing. Finally, Tanel places its mark on all of its shoes and uses it in its advertising and promotional materials. The

**56**

factors relevant to strength militate in favor of a finding that Tanel's 360° mark is strong and deserves broad protection.

One type of confusion that could result from permitting Reebok's sale of these shoes can be described as "reverse confusion." *See Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.,* 408 F.Supp. 1219 (D.Colo.1976), *modified on other grounds,* 561 F.2d 1365 (10th Cir.1977), *cert. dismissed,* 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805 (1978). That is, Reebok's use of plaintiff's mark may result in confusion as to the origin of *Tanel's* product. Reebok is a much larger and longer established enterprise than Tanel, and the Reebok trademark and trade name is one of the best if not the best known names to potential purchasers of footwear. Purchasers who saw "360°" on a Reebok shoe before ever seeing a Tanel shoe might conclude that Tanel was in some way affiliated with Reebok, that plaintiff's shoes were made by Reebok, or that Tanel in using "360°" was imitating Reebok.

Considering all of these factors, I find that it is likely that consumers would be confused by Reebok's use of this mark, and thus Tanel is likely to succeed on the merits of its infringement claim. The motion for a preliminary injunction will therefore be granted.

### ORDER

For the foregoing reasons it is ORDERED:

(1) After opportunity for further hearing as provided in paragraph (2) below, a preliminary injunction will be issued on terms identical with those of the Temporary Restraining Order, subject to such modifications as may be proposed by any party and approved by the court. Until that preliminary injunction is entered, the Temporary Restraining Order remains in effect.

(2) Counsel shall consult with each other to determine whether agreement can be reached as to the form of the preliminary injunction to be issued in accordance with this Memorandum. If no agreement is reached, each party may file, on or before April 23, 1990, its proposal as to the form of order to be entered, and a hearing to determine the form of order will be held at 3:30 p.m. on April 26, 1990. Counsel may be available by telephone for this hearing if they wish.