**LOEGERING MFG., INC., Plaintiff,**

v.

**GROUSER PRODUCTS, INC., and Ronald J. Hoffart, Defendants.**

No. A3–02–08.

United States District Court, D. North Dakota, Southeastern Division.

Aug. 6, 2004.

Steven Anthony Johnson, Vogel Law Firm, Fargo, ND, Lori J. Marco, Briggs & Morgan, Kurt J. Niederluecke, Fredrikson & Byron, PA, Malcolm M. Moore, Moore & Hansen, Minneapolis, MN, for plaintiff.

Gary R. Thune, Pearce & Durick, Bismarck, ND, Michael S. Neustel, Eric G. Olsen, Neustel Law Offices, Ltd., Fargo, ND, Keith M. Sorge, Jon R. Trembath, Merchant & Gould, Minneapolis, MN, Kirstin L. Stoll–DeBell, Merchant & Gould PC, Denver, CO, Patricia A. Roscoe, Attorney at Law, Fargo, ND, for defendants.

## MEMORANDUM OPINION AND ORDER

ERICKSON, District Judge.

Before the Court is Plaintiff's Motion for Partial Summary Judgment (doc. # 59), Defendants' Motion for Partial Summary Judgment (doc. # 86), and Plaintiff's Motion to Dismiss Defendant Grouser (doc. # 121). The Court held a hearing on July 8, 2004.

### SUMMARY OF HOLDING

■ The patentee is not entitled to a patent if he or she did not invent the subject matter. George Loegering (George), Marilyn Loegering (Marilyn), and Louis Keller (Keller) all testified that George invented the subject matter at issue and also communicated this invention to Ronald Hoffart (Hoffart). However, the testimony of interested parties, standing alone, is insufficient to invalidate a patent at the summary judgment stage. While Plaintiff does offer documentary evidence to corroborate the testimony of George, Marilyn, and Keller, it is insufficient to grant Plaintiff judgment as a matter of law.

A patentee is also not entitled to a patent if he or she placed the invention on sale more than one year prior to applying for the patent. Plaintiff alleges a number of transactions occurred prior to the on-sale bar date that constitute commercial offers for sale of the invention. However, general contract principles that define some of the transactions as a matter of law or factual questions about precisely what kind of product was placed on sale preclude granting summary judgment.

Whether a trademark is entitled to protection depends on what category the mark belongs to. The SOFT TRACK mark belongs to either the suggestive or descriptive category. With both tests that distinguish between these categories, there are questions of material fact.

■ A trademark may be cancelled if it was fraudulently obtained. Plaintiff alleges that Defendants knowingly gave materially false statements to the Patent and Trademark Office (PTO). There is a question of material fact on whether Grouser affixed the trademark to the goods. The statement that the word "soft" was not descriptive was not made knowing that it was allegedly false.

A patent licensee may have standing to sue for infringement as a co-party with the patentee if its license confers sufficient rights. In this case, Hoffart granted Grouser a license that at least conveyed the right to prevent others from manufacturing or selling the invention. These

rights are sufficient to confer co-party standing on Grouser.

BACKGROUND

Loegering Manufacturing (Loegering) was founded in 1971 by George, his wife, Marilyn, and his father-in-law, Keller. (George 11–19–03 Decl. ¶ 2) The company assembles over-the-tire skid steer loader tracks. At its inception, Loegering Manufacturing sold track that utilized a patented track pad design invented by Keller. (George 11–19–03 Decl. ¶¶ 2–3)

In the fall of 1973, Loegering hired Hoffart as general manager. (Hoffart Depo. at 11–12) While Hoffart worked at Loegering, George alleges that he was working on new pad designs. (George 11–19–03 Decl. ¶¶ 5–10) One of these designs included a clean-out opening in the side plate of the pad. (George 11–19–03 Decl. Ex. B) The purpose for this opening was to allow dirt and other debris to escape from the pad, thereby making it easier to adjust the track.

George alleges that he built a set of tracks to test out his new designs. (George 11–19–03 Decl. ¶ 7) One pad in this track included the side clean-out opening, and the remaining pads included a different design. (Id.) Hoffart took this track to Industrial Plating (Industrial) to be plated, and on August 16, 1974 he picked it up. (Id. ¶ 8; Ex. C; Ex. D) On August 30, George alleges that Hoffart accompanied him to test out this same track. (Id. ¶ 10) Hoffart denies ever seeing a pad with a side clean-out opening. (Hoffart 12–22–03 Decl. ¶ 7) In September 1974, Loegering terminated Hoffart's employ. (Hoffart Depo. at 12)

At some point after leaving Loegering, Hoffart started his own business that assembled over-the-tire skid steer loader tracks. (Hoffart Depo. at 20) He built his first set of tracks in Rugby, North Dakota, and George and Keller inspected them without his authorization. (Hoffart 12–22–03 Decl. ¶ 5) In 1976 he incorporated this business under the name Grouser Products (Grouser). (Hoffart 3–8–04 Decl. Ex. A1) Hoffart is the only owner of Grouser. (Hoffart Depo. at 21)

After viewing Hoffart's track in Rugby, George decided to memorialize in writing the pad designs he had been working on during the time Loegering had employed Hoffart. (Exhibits to Rantanen Decl.) George allegedly drew Sketches 1–8 on August 11, 1975. Sketch 9 is a representation of the track design George saw Hoffart using. On August 12, 1975, George allegedly drew Sketch 10, which depicts an opening in the side of the pad. Sketches 1–9 were sent to Loegering's patent attorney, Malcolm Moore, in August 1975. (Pl. Resp. Defs.' 2d Set Interrogs. at 2) Sketch 10 was sent to Moore at some point in 2001. (Id.) Features from the designs in Sketches 1–8 were eventually patented by George and Keller in 1978. (George 11–19–03 Decl. Ex. H)

Hoffart alleges that in 1994 he first came up with the idea of an opening in the side plate of a pad to allow debris to escape. (Hoffart Depo. at 107) In March 1996, he had Integra Castings (Integra) manufacture a set of track that incorporated this side clean-out opening in the pads. (Hoffart 12–22–03 Decl. ¶ 12 & Ex. A2) Then Hoffart shipped this track to Case Corporation (Case) to test on a skid steer loader. (Id. ¶ 13) Based on this testing, Hoffart made some changes to his design and had Integra manufacture another set of track that incorporated these modifications. (Id. ¶ 18) In July 1996, Hoffart shipped this second set of track to Case for testing. (Id. ¶ 19)

Also in July 1996, Case and Grouser entered into a Purchase Agreement regarding Grouser's tracks. (Marco 11–20–03 Decl. Ex. 16) Exhibits A and B to the Purchase Agreement reference "D" Series

track. (*Id.*) The "D" Series track that Grouser sells today includes the side clean-out opening in the pads. (Hoffart Depo. at 123–24) Hoffart alleges that at the time of the agreement, the term "D" Series track only referred to whatever the "next generation" of track, which, at the time, may not have included the opening in the side plate. (Hoffart 12–22–03 Decl. ¶ 23) On December 10, 1997, Hoffart filed an application for a patent on this track design, and he received patent # 5,951,124 ('124) on September 14,1999. (Stoll–DeBell 12–23–03 Decl. Ex. 4)

At some point, apparently in 2001, Grouser became aware of other companies selling tracks that incorporated an opening in the side plate. In March 2001, Grouser wrote to Loegering and McLaren Industries (McLaren) to inform them that tracks they were selling infringed on the '124 patent. (Answer Ex. A; Johnson 2–5–04 Decl. Ex. 5) To resolve the dispute with McLaren, Hoffart granted McLaren a license. (Johnson 2–5–04 Decl. Ex. 6) Grouser and Loegering were not able to resolve their dispute, and this declaratory judgment action followed.

ANALYSIS

I. Summary Judgment Motions

Summary judgment is appropriate where, viewing the record in the light most favorable to the nonmoving party, no genuine issue of material fact exists. *Anderson v. N.D. State Hosp.,* 232 F.3d 634, 635 (8th Cir.2000) (quoting *Pace v. City of Des Moines,* 201 F.3d 1050, 1052 (8th Cir. 2000)). A court gives the nonmoving party the benefit of all reasonable inferences. *Id.* (quoting *Pace,* 201 F.3d at 1052). The moving party bears the burden of proving that there is no genuine issue of material fact. *Burchett v. Target Corp.,* 340 F.3d 510, 516 (8th Cir.2003). However, the "nonmoving party may not rest upon mere denials or allegations, but must instead set forth specific facts sufficient to raise a genuine issue for trial." *Id.* (quoting *Rose–Maston v. NME Hosps., Inc.,* 133 F.3d 1104, 1107 (8th Cir.1998)).

A. Plaintiff's Motion for Partial Summary Judgment

1. Did Not Invent

 A patent is presumed valid. *Chiron Corp. v. Genentech, Inc.,* 363 F.3d 1247, 1253 (Fed.Cir.2004) (citing 35 U.S.C. § 282 (2002)). However, a person is not entitled to a patent if he or she did not invent the subject matter sought to be patented. 35 U.S.C. § 102(f) (2002). To prove derivation under § 102(f), the party asserting invalidity must prove by clear and convincing evidence "both prior conception of the invention by another and communication of that conception to the patentee." *Eaton Corp. v. Rockwell Int'l Corp.,* 323 F.3d 1332, 1344 (Fed.Cir.2003) (quoting *Gambro Lundia AB v. Baxter Healthcare Corp.,* 110 F.3d 1573, 1576 (Fed.Cir.1997)).

George claims that he invented the clean-out opening that is the subject of the '124 patent. George, Marilyn, and Keller all testified that Hoffart saw George's design and accompanied George when he tested the new design on the Jacobson farm in 1974. At the top of Sketch 10, George wrote that Hoffart accompanied him to the Jacobson farm to test this new track.

 When a plaintiff challenges the validity of a patent with testimony of interested persons and his friends, he must meet a very heavy burden. *Woodland Trust v. Flowertree Nursery, Inc.,* 148 F.3d 1368, 1371 (Fed.Cir.1998). The court looks skeptically upon the oral testimony of an alleged inventor who asserts priority over a patentee's rights. *Id.* (quoting *Price v. Symsek,* 988 F.2d 1187, 1194 (Fed. Cir.1993)). Therefore, the inventor's testi-

mony must be supported by some type of corroborating evidence. *Id.* (quoting *Price*, 988 F.2d at 1194).

■ In this case, George only offers his own testimony and the testimony of the two relatives who founded Loegering to support his claim that he invented the clean-out hole and that he communicated this design to Hoffart. Plaintiff argues that several pieces of evidence corroborate the testimony of these interested parties. First is the testimony of Steve Jacobson (Steve), who was present when George tested the new track design at the Jacobson farm. (Steve 12–30–03 Decl. ¶ 3) Steve only testified that a young man was present for the test and that the track had "clean-out features in the side plates of the track pads." (*Id.* ¶¶ 3–4) Steve did not confirm that it was actually Hoffart who was present nor did he confirm that a track pad had an opening in the side plate.[1]

Second, Plaintiff offers receipts of transactions between Loegering and Industrial. The August 14, 1974 receipt indicates that Hoffart dropped off plates at Industrial for plating. (George 11–19–03 Decl. Ex. C) An August 16, 1974 receipt indicates that Hoffart picked up a set of "exper" pads. (*Id.* Ex. D) At most, one can infer from these receipts that Hoffart dropped off and then picked up a set of experimental track pads. However, these receipts do not describe the design features of these experimental pads. Similarly, Marilyn's calendar entry on August 30, 1974 noting Hoffart's trip with George to Gwinner to test the "exp" tracks does not corroborate that this experimental track had the design feature at issue in this case. (George 11–19–03 Decl. Ex. F)

Finally, Plaintiff offers Sketch 10. This sketch shows the opening in the side plate and was allegedly drawn in 1975. (George 11–19–03 Decl. Ex. B) Defendants' expert concluded that Sketch 10 was not drawn on the same paper as Sketches 1–9, and Sketch 10 contained Eucalyptus fibers. (Rantanen 12–16–03 Decl. at 2) Apparently Eucalyptus fiber was not used in American paper mills until after 1975. (*Id.*) At oral argument, Plaintiff asserted that its expert report disputed the findings of Defendants' expert.[2] Putting aside the factual dispute over the authenticity of the age of the paper, Sketch 10 does not corroborate the allegation that George communicated this design to Hoffart.

Hoffart states that he does not remember ever seeing George's design or helping him test out a prototype. For purposes of summary judgment, the testimony of George, Marilyn, and Keller is insufficient to overcome Hoffart's testimony. *Woodland Trust*, 148 F.3d at 1371. Plaintiff's documents are insufficient corroboration at the summary judgment stage. Therefore, summary judgment is not appropriate under 35 U.S.C. § 102(f).

### 2. On–Sale Bar

A person is not entitled to a patent if the invention was on sale in this country for more than a year prior to the date of the application for the patent in the United States. 35 U.S.C. § 102(b). In this case, Hoffart applied for the patent on December 10, 1997, so the on-sale bar date is December 10, 1996.

■ Whether a patent is invalid under 35 U.S.C. § 102(b) is ultimately a question of law. *Monon Corp. v. Stoughton Trail-*

---

1. The majority of the pads on this track utilized a clean-out feature that consisted of circular notches in each upper corner of the outer side plates. (George 11–19–03 Decl. ¶¶ 4, 7) It was this clean-out feature that

George eventually patented. (George 11–19–03 Decl. Ex. H)

2. It does not appear that a copy of this expert report has been filed with the Court.

*ers, Inc.*, 239 F.3d 1253, 1257 (Fed.Cir. 2001). However, this question of law determination is necessarily based upon underlying questions of fact. *Id.* (quoting *Weatherchem Corp. v. J.L. Clark, Inc.*, 163 F.3d 1326, 1332 (Fed.Cir.1998)).

 The on-sale bar applies when the product was the subject of a commercial offer for sale and the invention was ready for patenting. *Pfaff v. Wells Electronics, Inc.*, 525 U.S. 55, 67, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998). A "commercial offer for sale" must "meet the level of an offer for sale in the contract sense, one that would be understood as such in the commercial community." *Linear Tech. Corp. v. Micrel, Inc.*, 275 F.3d 1040, 1048 (Fed.Cir.2001) (quoting *Group One Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1046 (Fed.Cir.2001)). The party raising an on-sale bar defense bears the burden of proving a sale by clear and convincing evidence. *Id.* at 1047. A court should analyze whether there was an offer for sale by applying the law of contracts as it is generally understood. *Id.* (quoting *Group One*, 254 F.3d at 1047). To apply the law of contracts as it is generally understood, a court must look to the body of state and federal court case law interpreting individual state's versions of their UCC. *Id.* An invention was ready for patenting if it had been reduced to practice before the critical date or if the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention.[3] *Pfaff*, 525 U.S. at 67–68, 119 S.Ct. 304.

 "An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Restatement (Second) of Contracts § 24 (1981).

To determine whether an offer has been made, a court should look closely at the language of the proposal itself. *Group One*, 254 F.3d at 1048. Factors that may be looked at to determine whether an offer has been made include the following: 1) the ordinary meaning of the language used, 2) the context of the language in connection with prior communications between the parties, 3) the selectivity of the communication, 4) the parties' course of dealings, 5) local usage or trade usage, 6) the social relationship of the parties, 7) the relative completeness of the terms, 8) the nature of the subject matter, and 9) the foreseeability that the addressee will rely upon it. Joseph M. Perillo, *Corbin on Contracts* § 2.2 at 108–10 (Rev. ed.1993). "Mere advertising and promoting of a product may be nothing more than an invitation for offers ...." *Group One*, 254 F.3d at 1048 (citing Restatement (Second) of Contracts § 26).

### a. Transactions with Case

 The July 1, 1996 Purchase Agreement, entered into before the on-sale bar date, contains the following relevant language:

> [Grouser] agrees to sell to [Case] during the term hereof and on the terms and conditions set forth herein, such items listed on Exhibit B, attached hereto and incorporated herein by reference (hereafter "Products"), as may be ordered from time to time by [Case]. In addition, [Grouser] agrees to sell to [Case] service parts for the items listed on Exhibit A (hereafter "Parts"), as may be ordered from time to time by [Case].

The ordinary meaning of this language is that Grouser has agreed to sell Case products listed in Exhibits A and B when Case orders them. This was not merely a communication from Grouser to Case either.

**3.** Defendants did not dispute this second prong.

This was a negotiated agreement signed by both parties.

The Purchase Agreement was a selective communication since it was not made to the skid steer loader manufacturing community at large, but instead was only made to Case. The communication is relatively complete by including prices, the discount, descriptions of the products, directions on how Case should order, delivery information, payment instructions, and a warranty. After going to all the trouble of entering into a written agreement, it was foreseeable that Case would rely upon this communication from Grouser. Based on the ordinary language of the Purchase Agreement, the selectivity of the communication, the relative completeness of the terms, the subject matter, and the likelihood that Case would rely on this agreement, Grouser did make an offer to sell products to Case. Perillo, *Corbin on Contracts* § 2.2 at 108–10.

Whether the products that were the subject of this Purchase Agreement included track that had an opening in the side plate cannot be resolved in this summary judgment motion. Paragraph 2B of the Purchase Agreement includes the following relevant language: "Products supplied under this Agreement are to be Seller's then current design as accepted by Case's Product Engineering Department." (Marco 11–20–03 Decl. Ex. 16) Hoffart alleges that at the time Grouser entered into this agreement, he was still testing the opening in the side plate and did not know whether tracks would work with that opening. (Hoffart 12–22–03 Decl. at ¶¶ 19, 23) Accepting Hoffart's testimony as true, at the time the parties entered into this agreement, Grouser was not offering for sale track that incorporated the invention at issue.

Exhibits A and B to the agreement both carry the title "D"-Series CastTrac. While the "D"-Series track today does include an opening in the side plate of the pads, (Hoffart Depo. at 123–24), Hoffart alleges that the use of "D"-series in this agreement was merely a reference to the "next generation" track, whatever that ended up being. (Hoffart 12–22–03 Decl. ¶ 23) Also, the part numbers in Exhibit B reference "C"-series track. (*Id.*) This evidence poses a genuine issue of material fact as to whether Grouser was offering for sale track with a side clean-out opening.[4]

Plaintiff alleges that Grouser sold Case track with an opening in the side plate of the pads on July 18, 1996 and July 30, 1996. Hoffart claims that the July 18 invoice was for the second set of experimental tracks that he sent to Case for testing. (Hoffart 12–22–03 Decl. ¶ 19) The invoice appears to corroborate this claim. The invoice was for only one set of track. (Marco 11–20–03 Decl. Ex. 19) In the price column, it stated ".0001." (*Id.*) The invoice also noted that this transaction was not subject to either state or federal taxes. (*Id.*)

The July 30 purchase order does not specify a quantity or type of track. (Marco 11–20–03 Decl. Ex. 21) It states that "[t]his is a blanket order for the purchase of tracks for Skid Steers. This order is pursuant to the agreement made July 1, 1996." (*Id.*) The order form has the same "Exhibit B" attached to it that the Purchase Agreement had, which apparently references the "C"-Series tracks. Therefore, there is a question of material fact as to what product this July 30 purchase order referred to. Neither the July 18 nor the July 30 invoices establish as a matter

4. One has to wonder what kind of track Case thought Grouser would be supplying after it had received a set of track in March 1996 and again in July 1996 that included an opening in the side plate of the pads. (Hoffart 12–22–03 Decl. at ¶¶ 13, 19)

of law that the invention was offered for sale prior to December 10, 1996.

Plaintiff also argues that Grouser made an offer for sale to Case in November 1996. However, the Bill of Lading it offers as evidence does not carry a date.[5] (Marco 11–20–03 Ex. 23) Also, it appears that this Bill of Lading originally requested "C"-series track, and then it was changed later, at some unspecified date, to "D"-series. (*Id.*) Finally, a notation on the form, allegedly made May 5, 1997, notes that the order was voided. (*Id.*) This evidence is insufficient to prove as a matter of law that a commercial offer for sale was made.

### b. Other Transactions

■ Plaintiff argues that the following transactions constitute commercial offers for sale prior to the on-sale bar date: a December 2 bill of lading for a set of "D"-series "new style" soft tracks for Bright Equipment, a December 5 bill of lading for "D"-series track for Hayward Implement, a December 6 bill of lading for "D"-series track for Metrac, and a December 9 quote/order for Gateway Ford Tractor. (Marco 11–20–03 Decl. Exs. 28, 29, 31, 34) Plaintiff argues that when an order is entered into the computer, it is a completed sale because Grouser views it as such.

To accept an offer, an offeree must make a manifestation of assent to the offeror. *Linear Tech.*, 275 F.3d at 1052 (citing Richard A. Lord, *Williston on Contracts* § 4:1, at 236 (4th ed.1990)). Merely entering an order into a booking system

does not constitute acceptance of that offer because there has been no communication to the offeror. *Id.* Therefore, at the time Grouser enters these orders into its computer, it has not made a commercial offer for sale. *Id.*

In addition, all these orders pose the same material question of fact about what kind of track was being sold, as discussed earlier.[6] At the time these orders were entered into Grouser's system, Hoffart alleges he didn't know whether the "D"-series track would incorporate the hole design he was testing. (Hoffart 12–22–03 Decl. ¶ 23)

■ Plaintiff also points to a couple of instances where Grouser provided price quotes on its tracks. (Marco 11–20–03 Decl. Exs. 22 & 25) Even assuming that the "D"-Series track referenced in these quotes was track that incorporated an opening in the side plate, this activity does not constitute a commercial offer for sale. *See Group One*, 254 F.3d at 1048 (citing Restatement (Second) of Contracts § 26) (advertising and promoting the product are usually invitations for offers).

### c. Transactions with Integra

■ Finally, Plaintiff alleges that certain purchases by Grouser from Integra constitute commercial offers for sale. When the manufacturer of the invention accepts an offer from the inventor to produce the invention for commercial purposes, the on-sale bar is triggered. *Special Devices, Inc. v. OEA, Inc.*, 270 F.3d

---

**5.** The Production Reports Plaintiff offers to corroborate this November 1996 offer are not self-explanatory. (Marco 11–20–03 Decl. Ex. 24) Without testimony explaining this report, it appears to be a series of numbers and dates in columns under the headings "Built" and "Shipped." (*Id.*)

**6.** The Gateway quote/order contains a notation that the tracks "Will Have The New,

Open–Style, 'D' Series Pads!" (Marco 11–20–03 Decl. Ex. 34) One could reasonably infer that this describes the invention at issue. However, this notation appears after another note that was entered on 12–27–96, which is after the on-sale bar date. (*Id.*) Viewing the evidence in the light most favorable to Defendants, the Court must assume that this "open-style" remark was added after the on-sale bar date.

1353, 1355 (Fed.Cir.2001). There is no "supplier" exception to the on-sale bar. *Id.* The use of a subsequently patented device for experimental purposes does not trigger the on-sale bar. *Monon Corp.*, 239 F.3d at 1258 (citations omitted). Further testing for durability purposes also does not trigger the on-sale bar. *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 551 (Fed.Cir.1990).

In March 1996, Grouser had Integra manufacture one set of track castings with the side clean-out hole. (Marco 11–20–03 Decl. Ex. 37; Hoffart 12–22–03 Decl. ¶ 12) As previously discussed, Hoffart alleges that he had this set of track made for experimental purposes. Therefore, this Integra transaction does not trigger the on-sale bar. *Monon Corp.*, 239 F.3d at 1258.

In July 1996, Integra shipped another set of track castings to Grouser. (Marco 11–20–03 Decl. Ex. 39) Hoffart alleges that this set of track was also for experimental purposes. (Hoffart 12–22–03 Decl. ¶ 18) This transaction would also not trigger the on-sale bar. *Monon Corp.*, 239 F.3d at 1258.

Plaintiff alleges that on September 10, 1996, Grouser ordered 76,000 track pads with openings in the side plates from Integra. (Loegering Corrected Statement Material Facts ¶¶ 36–37) Plaintiff only provides internal Integra documents to support this contention. (Marco 11–20–03 Decl. Exs. 44, 46, 48) Without testimony to explain these documents, it is not clear what they represent. Rick Bell (Bell), the president of Integra, alleges that toward the end of 1996, it performed a pilot run, on its own initiative, to verify that it could produce sufficient quantities. (Bell 12–22–03 Decl. ¶ 6) The internal Integra documents Plaintiff produced might represent this pilot run. Regardless, Bell alleges that all the pads with openings in the side plate that Integra manufactured for Grouser prior to December 10, 1996, were for experimental purposes or Hoffart rejected them. (*Id.* ¶ 8)

In this case, each Grouser order before December 10, 1996 was for a prototype of the invention. Therefore, the on-sale bar was not triggered by its purchases from Integra. *Special Devices*, 270 F.3d at 1355.

### 3. Inequitable Conduct

Inequitable conduct before the Patent and Trademark Office (PTO) renders a patent unenforceable. *Minnesota Mining and Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1569 (Fed.Cir.1992). It is within the trial court's discretion to determine whether there was inequitable conduct. *Id.* Inequitable conduct includes "affirmative misrepresentations of material facts, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." *Li Second Family Ltd. P'ship v. Toshiba Corp.*, 231 F.3d 1373, 1378 (Fed.Cir.2000).

Plaintiff alleges that Hoffart failed to disclose the material fact that he had placed the invention on sale prior to a year before applying for a patent. As previously discussed, there are questions of material fact as to whether Grouser placed the invention on sale more than one year before Hoffart applied for the patent. For this reason, summary judgment is also inappropriate on a theory of inequitable conduct.

### 4. Exceptional Case

Plaintiff has also moved for summary judgment on the issue of attorney fees. In an exceptional case, the court may award reasonable attorney fees to the prevailing party. 35 U.S.C. § 285. Since there is no prevailing party in this case yet, the Court may not award attorney fees. *Id.*

### 5. Trademark

Plaintiff also sought summary judgment on the issue of the SOFT TRACK trademark. In its brief in opposition, Defendants informed the Court that it would address Plaintiff's arguments in its own motion for partial summary judgment. The Court will address the trademark issue in the following section.

### B. Defendants' Motion for Partial Summary Judgment

Defendants seek to dismiss Counts VIII and IX of Plaintiff's Amended Complaint. Count VIII seeks damages under 15 U.S.C. § 1120 (1998), which creates liability for fraudulently procuring a trademark registration. Count IX seeks attorney fees under 15 U.S.C. § 1117, which allows attorney fees in an "exceptional" trademark infringement case. Plaintiff seeks a declaration that it did not infringe on Grouser's registered trademark on the basis that the mark is invalid, and it also seeks summary judgment on the § 1117 fees issue.

### 1. Trademark Validity

■ A registered trademark is presumed valid. 15 U.S.C. § 1115(a). This presumption may be rebutted with sufficient evidence. *Educ. Dev. Corp. v. Econ. Co.*, 562 F.2d 26, 28 (10th Cir.1977); *Tanel Corp. v. Reebok Int'l, Ltd.*, 774 F.Supp. 49, 51 (D.Mass.1990) (quoting *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 373 (1st Cir.1980)).

### a. Suggestive or Descriptive

■ In order to be registered, a mark must be capable of distinguishing the applicant's goods from those of others. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). When a mark is inherently distinctive, it is entitled to protection. *Id.* The courts have created the following five categories to describe which types of marks are inherently distinctive: 1) generic, 2) descriptive, 3) suggestive, 4) arbitrary, and 5) fanciful. *Id.* Suggestive, arbitrary, and fanciful marks are considered inherently distinctive. *Id.* Descriptive marks are not inherently distinctive. *Id.* at 769, 112 S.Ct. 2753. However, a descriptive trademark may be registered if it acquires "secondary meaning." *Two Pesos*, 505 U.S. at 769, 112 S.Ct. 2753. To establish secondary meaning, a trademark user must show that through "long and exclusive use in the sale of the user's goods, the mark has become so associated in the public mind with such goods that the mark serves to identify the source of the goods and to distinguish them from those of others." *First Bank v. First Bank Sys., Inc.*, 84 F.3d 1040, 1045 (8th Cir.1996) (quoting *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 870 (8th Cir.1994)).

Plaintiff argues that "SOFT TRACK" is merely a descriptive mark that has not acquired secondary meaning. As the parties have explained, there are essentially two kinds of pads in this industry: one has a steel bottom and the other has a rubber or plastic bottom. The track that is referred to with the SOFT TRACK mark is made from plastic. (Hoffart 12–23–03 Decl. ¶ 9) Plaintiff argues that since plastic pads are soft in comparison to steel pads, the use of SOFT TRACK only in connection with the plastic pads makes it a descriptive mark.

■ Determining whether a mark is descriptive as opposed to suggestive is difficult because the distinction is not always readily apparent. *Educ. Dev. Corp.*, 562 F.2d at 29; *West & Co., Inc. v. Arica Inst., Inc.*, 557 F.2d 338, 342 (2d Cir.1977). One test for distinguishing between descriptive and suggestive inquires as to "how immediate and direct is the thought process from the mark to the particular product."

*Tanel Corp.*, 774 F.Supp. at 51 (quoting *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 349 (9th Cir.1979)). If a potential buyer must use "thought, imagination, or perception" to connect the mark with the goods, then the mark is suggestive. *Educ. Dev. Corp.*, 562 F.2d at 29. If a mark directly conveys to a potential buyer the ingredients, qualities, or characteristics of the goods, then the mark is descriptive. *Tanel Corp.*, 774 F.Supp. at 51; *see also Educ. Dev. Corp.*, 562 F.2d at 29. The "potential buyer" for this inquiry is someone who would actually purchase this product and not the public in general. *Id.*

■ Neither party has presented any evidence on how buyers in this industry view the trademark SOFT TRACK. The closest evidence the Court could find was Hoffart's opinion that the first name Case would associate with a soft track is Grouser. (Hoffart Depo. at 45) At this point, there are still questions of material fact as to whether SOFT TRACK is a suggestive or descriptive mark.

■ Another test to distinguish whether a trademark is descriptive or suggestive is to determine whether a competitor would need to use the term to describe its products to purchasers. *Educ. Dev. Corp.*, 562 F.2d at 29. Hypothetically, since these tracks are made of rubber or a plastic material, one could argue that a competitor could use "rubber," "urethane," or "polycarbonate" to describe its tracks. However, the factual record is not sufficiently developed for the Court to make a determination as a matter of law on this test.

b. Fraudulent Procurement

As an alternative basis for summary judgment, Plaintiff argues that Defendants fraudulently procured the SOFT TRACK trademark. A third party may petition to cancel a registered trademark if its registration was obtained fraudulently. 15

U.S.C. § 1064(3). The third party may also bring a civil action to recover damages caused by the fraudulently procured registration. 15 U.S.C. § 1120.

■ A registered trademark has been fraudulently procured when the applicant knowingly made false, material representations of fact in connection with the application. *Metro Traffic Control, Inc. v. Shadow Network, Inc.*, 104 F.3d 336, 340 (Fed.Cir.1997). The Lanham Act requires an applicant not to "make *knowingly* inaccurate or *knowingly* misleading statements in the verified declaration forming a part of the application for registration." *Bart Schwartz Int'l Textiles, Ltd. v. FTC*, 289 F.2d 665, 669 (Cust. & Pat.App.1961) (emphasis in original). The registrant has not commit fraud if he merely made a "false misrepresentation" based on an honest misunderstanding, inadvertence, negligent omission, or other similar reason. *Smith Int'l, Inc. v. Olin Corp.*, 209 U.S.P.Q. 1033, 1043 (Trademark Tr. & App. Bd.1981). The party challenging the registration must prove the alleged fraud by clear and convincing evidence. *Metro Traffic Control*, 104 F.3d at 340.

■ Plaintiff alleges that Hoffart knowingly made a false material representation when he alleged that the SOFT TRACK mark was used on goods. The mark must be applied to the goods or to a tag or label for the goods, and the goods must be sold or transported in commerce in order to register the mark. *In re Ultraflight, Inc.*, 221 U.S.P.Q. 903, 903 (Trademark Tr. & App. Bd.1984). Therefore, whether the mark was affixed to the track is a material issue.

■ An application of the trademark to a manual that instructs the purchaser on how to assemble the product is considered using the trademark on goods. *Id.* However, if the manual included with the prod-

uct is not an integral part of using the product, affixing the trademark to the manual will not be considered using the trademark on the goods. *In re Star Bridge Sys., Inc.*, Serial No. 75/606,002, 2001 WL 1631348, *4, 2001 TTAB LEXIS 833, at *11 (Trademark Tr. & App. Bd., Dec. 19, 2001).

█ The SOFT TRACK mark appears on the mounting instructions for the track. (Stoll–DeBell 12–23–03 Decl. Ex. 1B) The mounting instructions explain, among other things, how to assemble the track, how to ensure that it is the proper length, how to test the track, and how to remove the track. (*Id.*) Hoffart alleges that Grouser ships mounting instructions that include the SOFT TRACK mark with the tracks. (Hoffart 12–23–03 Decl. ¶ 6) However, Grouser's sales manager testified that the only thing shipped with the tracks is a copy of the bill of lading.[7] (Luther Depo. at 137–38) This contradiction of Hoffart's testimony creates a question of material fact about whether the mark is used on the good.

In addition, neither side presented evidence on whether the intended user of this product would even rely on these mounting instructions. Since the relatively sophisticated purchaser of this product likely understands how to mount and adjust the track, it is unclear whether the mounting instructions are an integral part of using the track. *In re Star Bridge Sys., Inc.*, 2001 WL 1631348, *4, 2001 TTAB LEXIS 833, at *11; *see also In re Ultraflight, Inc.*, 221 U.S.P.Q. at 903 (stating that the assembly instructions for a hang-glider kit was as much a part of the product as the various pieces of the hang-glider).

█ Plaintiff also alleges that Michael Neustel, Grouser's patent attorney, knowingly made a false material representation when he told the trademark examiner that "soft" had no descriptive significance to the track. This statement is material because a descriptive mark that does not have secondary meaning may not be registered. *Nat'l Nu Grape Co. v. Guest*, 164 F.2d 874, 876–77 (10th Cir.1947).

As discussed earlier, the record is not sufficiently developed to determine whether SOFT TRACK is a descriptive or suggestive trademark. Even assuming soft is descriptive, none of the relevant evidence before the Court indicates that Neustel knew he made a false statement. Neustel told the PTO that the track had hard plastic pads attached to it. (Neustel Depo. at 39) Based on the Court's inspection of this pad at oral argument, this is an accurate description. Neustel did not consider the plastic pad to be soft or softer than a steel pad. (*Id.* at 44–46) Therefore, Neustel did not make a knowingly false statement when he stated that the term "soft" was not descriptive.

█ Defendants argue that even if they knowingly made false, material representations to the PTO, they are still entitled to summary judgment because Grouser held a valid trademark before registering it. If a party holds a valid, unregistered trademark and then fraudulently registers it, one who is infringing on that trademark may not recover damages under 15 U.S.C. § 1120. *Gilbert/Robinson, Inc. v. Carrie Beverage–Missouri, Inc.*, 989 F.2d 985, 991 (8th Cir.1993).

█ An unregistered trademark, or common-law trademark, arises from the

---

7. Defendants allege that Luther was never asked whether the mounting instructions were sent with the tracks. If he had been specifically asked that question, Defendants allege he would corroborate Hoffart's statement. At this time, all the Court has is Luther's statement that the *only* item shipped with the product is a copy of the bill of lading.

adoption and actual use of a word, phrase, logo, or other device to identify goods or services with a particular party. *First Bank*, 84 F.3d at 1044. To establish a common law trademark, the claimant must prove: 1) that it actually used the alleged trademark in connection with its product and 2) that the trademark was identified with the user in the minds of its customers. *Id.* For the first factor, the claimant must show that the mark was "used in commerce." *Chance v. Pac–Tel Teletrac, Inc.*, 242 F.3d 1151, 1157 (9th Cir.2001). "Use in commerce" means that the mark is placed on the goods, and the goods are sold or transported in commerce. 15 U.S.C. § 1127. As previously discussed, there is a question of fact as to whether the mounting instructions are included with the track. Since it is uncertain whether the trademark is applied to the goods, Defendants cannot establish a common law trademark as a matter of law.

As to the second factor, there is little evidence to support it. The most the Court could find was Hoffart's opinion that Case would think of Grouser's over-the-tire track first when it saw the SOFT TRACK mark. (Hoffart Depo. at 45) This question of fact also requires denying summary judgment.

### 2. 15 U.S.C. § 1117

Defendants also seek to dismiss Plaintiff's claim for attorney fees under 15 U.S.C. § 1117. In exceptional cases, a court may award reasonable attorney fees to the prevailing party. 15 U.S.C. § 1117(a). An exceptional case is one where a party's behavior was "malicious, fraudulent, deliberate, or willful." *Aromatique*, 28 F.3d at 877 (quoting *Badger Meter, Inc. v. Grinnell, Corp.*, 13 F.3d 1145, 1159 (7th Cir.1994)). To be exceptional, the party's behavior must have gone "beyond the pale of acceptable conduct." *Id.* An exceptional case does not require bad faith. *Hartman v. Hallmark Cards, Inc.*,

833 F.2d 117, 123 (8th Cir.1987). One weak element in a potential theory of recovery does not constitute an exceptional case. *Id.* at 123–24.

In *Aromatique*, the court found that there were exceptional circumstances to award attorney fees. 28 F.3d at 879. In that case, Aromatique falsely told competitors that its trade dress was federally registered to stop them from using the same trade dress for their product. *Id.* at 878. Some competitors did stop using the trade dress after receiving letters from Aromatique, and then Aromatique used this fact to bolster its trademark claim before the PTO. *Id.* The court found these actions to be "beyond the pale of acceptable conduct." *Id.* at 878–79.

This case does not present the same kind of conduct. Grouser did not fraudulently inform Loegering that it had a federally registered trademark. The only allegations here represent a couple of allegedly false statements to the PTO. The Court has already determined that one of these statements, even if false, was not made knowing that the assertion was false. This case is not "beyond the pale." *Aromatique*, 28 F.3d at 877

### II. Plaintiff's Motion to Dismiss

Plaintiff argues that Grouser lacks standing to bring its patent infringement counterclaim. Ordinarily, only the patentee or a successor in title to the patentee has standing to bring an infringement claim in its own name. *Enzo APA & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090, 1093 (Fed.Cir.1998). However, an exclusive-use licensee may participate as a co-party with the patent owner in an infringement claim. *Duplan Corp. v. Deering Milliken Research Corp.*, 522 F.2d 809, 815–16 (4th Cir.1975). To have standing to sue as a co-party, the licensee must "hold some of the proprietary sticks from the bundle of

patent rights, albeit a lesser share of rights in the patent than for an assignment and standing to sue alone." *Ortho Pharm. Corp. v. Genetics Inst., Inc.,* 52 F.3d 1026, 1031 (Fed.Cir.1995). The foundation for co-party standing is that the licensee has a right to prevent others from making, using, or selling the patented technology. *Id.* at 1032.

In *Kalman v. Berlyn Corp.,* 914 F.2d 1473, 1479 (Fed.Cir.1990), Dr. Peter Kalman brought a patent infringement action, and he sought to join a company that he had granted a license to. He had invented and patented a device for the filtration of heat-softened materials. *Id.* at 1475. Dr. Kalman and his brother then formed a company called Process Developments Limited (PDL). *Id.* Using Dr. Kalman's patent, PDL manufactured and marketed a device for plastic filtration. *Id.* Dr. Kalman and his brother are the sole owners and directors of PDL. *Id.* at 1476. The court held that the nexus between PDL and Dr. Kalman was so clearly defined that PDL had standing to sue as a co-party with Dr. Kalman. *Kalman,* 914 F.2d at 1482.

 In this case, Hoffart is the sole owner of Grouser. (Hoffart 3–8–04 Decl. ¶ 3) He and his wife are the sole directors. (*Id.* ¶ 4 & Ex. A3; Marlene Hoffart Decl. ¶ 2) Hoffart granted Grouser a license to use his patent, and Grouser manufactures and markets over-the-tire track that uses his patented design. (Hoffart 3–8–04 Decl. ¶¶ 9–10) The nexus between Grouser and Hoffart is so clearly defined that Grouser has standing to sue as a co-party with Hoffart. *Kalman,* 914 F.2d at 1482.

Plaintiff argues that Grouser could not have standing to sue as a co-party because Hoffart granted a license to McLaren. As an initial matter, the Court must note that it is troubled with the characterization of this McLaren agreement as a license that weakens Grouser's rights in the patent.

When Grouser enforced its rights as a licensee of this patent, the parties reached this agreement to settle the dispute. Courts generally favor and encourage settlements. *Justine Realty Co. v. American Nat'l Can Co.,* 976 F.2d 385, 391 (8th Cir.1992). If granting a third party a license to resolve an infringement dispute results in converting the original license holder to "bare licensee" status, this will not encourage settlement since a bare licensee may not be joined as a co-party with the patentee. *Abbott Labs. v. Diamedix Corp.,* 47 F.3d 1128, 1131 (Fed.Cir. 1995).

Even characterizing the McLaren agreement as a license for this patent, it was nonexclusive and only lasted until McLaren sold its current stock of infringing track pads. (Johnson 2–5–04 Decl. Ex. 6, ¶ 2.1) Even when there are other nonexclusive licensees, a licensee with sufficient rights may join the patentee as a co-party. *Abbott Labs.,* 47 F.3d at 1132; *Hill Phoenix, Inc. v. Systematic Refrigeration, Inc.,* 117 F.Supp.2d 508, 513 (E.D.Va.2000). A license confers sufficient rights when it grants the licensee the right to prevent others from making or selling the patented technology. *Ortho Pharm.,* 52 F.3d at 1032.

In this case, Hoffart granted Grouser the right to prevent others from making or selling the track pads with the side cleanout hole. (Hoffart 3–8–04 Decl. ¶¶ 9–10) Grouser enforced that right when it wrote to McLaren and Loegering seeking to have them stop making track pads that incorporated the invention it had a license for. (Answer Ex. A; Johnson 2–5–04 Decl. Ex. 5) Based on the clearly defined nexus between Grouser and Hoffart, Grouser engaged in this conduct with Hoffart's knowledge, which confirms the right to exclude in Grouser's license since Hoffart did not object. Grouser has standing

as a co-party with Hoffart. *Ortho Pharm.*, 52 F.3d at 1031–32.

DECISION

Plaintiff's Motion for Partial Summary Judgment is DENIED. Defendants' Motion to Dismiss Count VIII of Plaintiff's Amended Complaint is DENIED, and Defendants' Motion to Dismiss Count IX of Plaintiff's Amended Complaint is GRANTED. Plaintiff's Motion to Dismiss is DENIED.

IT IS SO ORDERED.